# Alexander et al. v. Theatre Realty Corporation et al.

(Decided March 23, 1934.)

CRAWFORD, MIDDLETON, MILNER & SEELBACH for appellants.

CARROLL & McELWAIN and H. H. NETTELROTH for appellees.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

This appeal involves the decision of but one question, which is, as stated in the opinion of the learned chancellor, whether or not the appellee Theatre Realty Corporation, the lessee and tenant in a lease for 99 years, has been released from its covenants by an assignment of the leasehold—without the present consent of the landlord—to a person known to be insolvent when the assignment was made. It is admitted that an assignment without the landlord's assent will not release the tenant from his covenants, unless it is expressly authorized by the lease, and the narrow question is whether the provision found in this lease for the exoneration of the tenant by assignment is brought into operation by its assignment to one at the time known to be insolvent and incapable of carrying out its covenants assumed.

With a view to giving a clearer and better understanding of the appellant landlord's contention that such character of assignment was not one made in good faith and does not give effect to nor realize the meaning and intent of the parties as expressed in the several clauses of the lengthy lease contract entered into by them, we deem it will be helpful to here briefly summarize the circumstances and negotiations leading up to its consummation.

The facts as to these matters are uncontroverted and show that about the first of 1928, Dr. Alexander, a wealthy citizen of Woodford county, Ky., anticipating his early receipt of some three-quarters of a million dollars from an expected sale of Chicago property, called upon A. J. Stewart, who was then president of the Fidelity & Columbia Trust Company, to advise with him as to the reinvestment of this fund. He advised him of his having had very satisfactory experience with investments in real estate held under long-term leases and inquired if his company had any real estate in Louisville it could offer him that was held under a long-term lease, or property that he might buy and then lease to some other person under a long-term lease; and, if so, he would be glad to have it submit to him an investment of that character.

Mr. Wirgman, another officer of the trust company, was called into the conference by Mr. Stewart, to whom Dr. Alexander again submitted his wish and plan for reinvestment of his expected receipt of the Chicago property sale proceeds, after which he was told that they would look into the matter for him and let him know.

A short while after this conference, Mr. Wirgman, knowing that Messrs. Chambers and Jones had bought the old St. Joseph Hospital property, located on Fourth street in Louisville, a good part of which they still held in the name of this trust company, and that such property was, in his judgment, a suitable and desirable one for meeting Dr. Alexander's purposes, took up the matter with its owners of their selling him the property and his leasing it for a long term back to them.

Chambers and Jones were favorably impressed with the suggestion, and negotiations looking to this end were begun by Mr. Wirgman.

After this, several conferences occurred and discus-

sions were had between them, carried on through Mr. Wirgman as agent for vendors, as to what should be the terms of the sale and lease back of the property by Dr. Alexander to vendors.

Finally, on February 17, 1928, after the matter had been thoroughly discussed and differences adjusted, Mr. Wirgman submitted the vendors' offer of sale of this property to Dr. Alexander for a cash price of $792,000, free of all incumbrances, and that, should he accept the offer, "it would be one of the considerations and conditions of the sale that, immediately following the delivery of the deed to you, you as the landlord and we as the tenant would enter into a lease of said property covering a period of ninety-nine [99] years, and providing for an annual money rental of $44,000," payable in monthly installments, and that the lease would further cover (a) payment of taxes by the tenant; (b) deposit of $250,000 of securities by tenant; (c) would allow the use of them for the purpose of erecting a building; (d) would provide for keeping the securities up to $250,000 in value, giving the tenant the income from same; (e) would provide for insurance at the tenant's expense; (f) would further provide "that the original tenant and any subsequent tenant might assign the lease to a corporation or other party that would assume the tenant's obligations in the lease, and that such assignment and assumption would release the tenant so assigning from personal responsibility"; and (g) that the lease would contain all other provisions, terms, and conditions usual and incident to long-term leases.

It appears that the vendors, Messrs. Chambers and Jones, had, during the first stages in these negotiations, suggested putting up but $150,000 as security for the performance of the proposed lease covenants, but that Dr. Alexander had objected to such an amount as too small, insisting that the security given should be as much as $250,000. Chambers and Jones were at first unwilling to pledge so large an amount of securities, but later agreed to, when they realized that as much as $250,000 would anyway be required for the suitable improvement of the property.

Mr. Wirgman's testimony is uncontradicted that in the initial stage of this sale and lease transaction the plan of Messrs. Jones and Chambers was to cause the property they were offering to sell to be conveyed to

Dr. Alexander through a corporation which they proposed to then organize and which would lease the property back from him, and that the rent, provided for in the lease, would be secured by its deposit of securities, deemed adequate therefor, as stated. He testified that at such time he did not think that Dr. Alexander even knew of the appellee Theatre Realty Corporation, and that at that time there was no thought of using it in connection with the deal, as title to the property was not then in the Theatre Realty Corporation; that the then purpose of all the parties was that a new corporation would be organized to become the tenant in the long-term lease; that negotiations had gone along relative to the price of the property and the amount of the rent and the amount of securities that was to be put up. Later, he stated, the vendors somewhat changed this plan, out of considerations of economy, by deciding to use the Theatre Realty Corporation, which they had previously organized for holding title to another portion of this property which they had improved and leased to the Loew Theatre Company, and it was agreed that, if for any reason they later desired to divest it of the lease, a new corporation could be organized and the lease assigned it, so as to release the Theatre Realty Corporation from further liability thereunder. Mr. Wirgman further testified that Dr. Alexander never had anything to say about, nor were any representations made him, as to who the tenant in the proposed lease was to be; that such matter was not decided upon until the negotiations for the sale and lease back were practically completed; and that Dr. Alexander's insistence and interest in the proposed lease appeared to center in the amount of security to be provided as a guaranty of the performance of the lease covenants, rather than as to who was to be his tenant.

The vendors' offer for a sale and release of the property finally was submitted to Dr. Alexander through Mr. Wirgman's letter of February 17, 1928, which was accepted by Dr. Alexander. The property was thereupon conveyed him by the Theatre Realty Corporation and a long-term, or 99-year lease, prepared with great care and particularity, according to the terms of the letter, was executed on March 27, 1928, by Dr. Alexander to the appellee Theatre Realty Corporation, as lessee thereof, providing for a fixed annual rental of $44,000, etc., throughout the lease term.

Thereupon the lessee at once exercised its right, provided for in clause 7 of the lease, to use the sale proceeds of the deposited securities for the erection of buildings upon the leased premises, subject to the trustee's approval, and therewith constructed improvements thereon at a cost somewhat in excess of the $250,000 sale proceeds of the deposited securities.

Clause 9 of the lease provided that, in case the improvements on the leased property should be damaged or destroyed by any casualty not covered by insurance, the tenant would be required to deposit with the trustee additional securities of the market value of the cost of repairing the damage.

By clause 19, the landlord was given the right to terminate the lease for default in the performance of any of its covenants, and it was provided that, should he so terminate it, he should have the right to re-enter and take possession of all the improvements thereon, and that, "as liquidated damages for failure to carry out the terms of this lease, the landlord was thereby entitled to the ownership of all improvements placed upon the leased property."

It appears that this lease was drawn by Mr. Wirgman for the vendors, Jones and Chambers, but that (he testified) none the less, while acting as their agent, he "tried to make the proposition perfectly fair" and the lease a "sound, ordinary ninety-nine year lease." This entire lease as drawn was submitted for approval to Judge Edwards, Dr. Alexander's attorney, when, after certain changes and modifications were made therein as suggested by him, it was executed in its present form.

Clause 16 of this lease, as to the proper construction of which the controversy presented in this suit has arisen, provides in part as follows:

"The Tenant may at any time, provided the Tenant is at such time not in default or delinquent under any of the terms of this lease, sell or assign the entire leasehold acquired by the Tenant under this lease, and provided the purchaser or assignee by writing duly executed, acknowledged, and recorded in the office of the Clerk of the County Court of Jefferson County, Kentucky, shall assume all of the covenants and obligations herein undertaken by the Tenant and then remaining unexecuted, the Tenant

shall be released from all other personal liability under this lease.''

It is to be here noted that this lease, containing this provision for its assignment, was executed in March, 1928, at a time when, as said by appellee, ''the post-war prosperity was at its height, and nothing had occurred to forecast the market crash that took place in October, 1929. The resulting collapse of real estate and rental values had not been dreamed of. The tenant believed that a ninety-nine year leasehold entailing an annual rental of $44,000, plus taxes, in addition to the expenditure of $250,000 by the tenant in the erection of improvements on the leased land, would prove profitable.'' Or as stated in the opinion of the chancellor:

''All of this transpired a year and a half before the stock market crash of 1929, which heralded the arrival of the Great Depression. * * * Improvements were commenced at once and on March 4, 1929, * * * the first rent payment was made to the tenant by a sub-tenant. * * * Probably by the end of 1929 the space in the building was pretty well filled, for Stewart, who had charge of the building, says the 'peak' of income from subleases was during 1930 when $51,136 was collected. He does, however, say that something over $53,000 was collected in 1931 and that the rents 'stipulated to be paid by tenants on their leases in existence in March, 1931,' was approximately $70,000, on an annual basis. But collections were becoming more difficult in 1931, so that in March, 1932, the gross, collectible rentals, on an annual basis, were estimated at about $47,000. The actual operating costs [including taxes], were approximately $27,000, which would leave $20,000 with which to pay the ground rent of $44,000. This deficit of $24,000 increased, in 1932, to more than $30,000. In short, Jones and Chambers * * * were at this time confronted with the probability, not only of the total loss of a third of that price [$250,-000] which they had put into improvements, but with a further operating loss of $30,000 or more each year. How long this would continue it was, of course, impossible to say, but they were so unfavorably impressed with the outlook, if the ground rent were not reduced, as to be willing, by giving away all of their interest, to write off as a total loss

the $250,000 put into improvements, not to mention the operating losses referred to."

At this time, Mr. Stewart, who was managing this property for the lessee, Theatre Realty Corporation, went to see Mrs. Alexander (Mr. Alexander having died in March, 1929), and his executor, seeking a reduction in the lease rent, when he told her (he testifies) the exact status of the building, what its income and expenses were, and that there was danger that the tenant would fail to pay the rent; and that, unless the lease rent could be reduced, "it looked like the situation would be worse."

Lessor declining to consent to the suggested rental reduction, appellee lessee began to look for a purchaser of the lease. To this end it was offered to Mr. Hieatt at the price of $5,000, which he declined for the reason that he was "broke" and unable to raise such an amount. The price was then reduced to $1,000, which he again found he was unable to raise, whereupon it was finally agreed that he would organize the Mercantile Realty Company, through which he would purchase and take over assignment of this lease, when $250 of its paid-in capital was paid by it to the Theatre Realty Corporation for its "out and out" assignment of the lease to it. Such assignment was made it June 20, 1932, in formal and strict compliance with the quoted provisions of clause 16 of the lease authorizing its assignment, in the stated mode and manner, with release of lessee from personal liability thereunder. Written notice was thereupon given appellant of the assignment and she was further notified that, by reason thereof, appellee claimed release from all liability for the payment of future rent. It is admitted that this assignment was made by lessee to an insolvent assignee for the avowed purpose of thereby securing release from the liability for the payment of future rent.

Appellee contends that, by clause 16 of the lease, it was given the unqualified right, at any time when not in default, to assign the entire leasehold, provided the purchaser, or assignee, by writing duly executed and recorded, assumed all the covenants and obligations undertaken by the tenant, and that by such assignment it was released from all further personal liability under the lease.

Appellant, on the other hand, insists that to give

the lease the construction as contended for by appellee would result in giving its clause 16 no real meaning; that it should not be construed as authorizing the tenant to terminate his liability under the lease by making at his will an assignment of the lease to one whom he knew was at the time insolvent and incapable of the performance of the covenants assumed.

It is further admitted that the assignment of the lease made by the Theatre Realty Corporation has divested it of all interest in the leasehold and the $250,000 expended in improving the property, even though the appellant has not yet exercised the right to terminate the lease under the express provision of its clause 19, entitling the landlord to the ownership thereof as liquidated damages.

The landlord, declining to accept as right or valid the Theatre Realty Corporation's claim that it was released from liability under the lease by such character of assignment to the Mercantile Realty Company and its refusal based thereon, to pay any future rent thereunder, filed petition in equity in the Jefferson circuit court, seeking a declaration of rights under the lease and asking that this assignment be adjudged invalid, and therefore fraudulent and void.

The learned chancellor, upon final submission of the cause, adjudged clause 16 of the lease should not be given the construction insisted upon by plaintiff, and accordingly adjudged that the assignment made by the Theatre Realty Corporation to the Mercantile Realty Company was valid, and released it from personal liability thereunder.

From this summary of the pleadings and evidence, we find that the one and narrow question presented by this appeal is as to the propriety of the construction of clause 16 of the lease as given it by the chancellor, and upon the determination of which our decision of this case must turn.

As bearing upon the disposition of that question and as responsive to appellee's contention made with respect to the relative and incidental rights of the parties as lessor, lessee, and assignor under the lease in question, the common-law rules applicable to their status as such, as defining their respective rights as affected by assignment of lease, are reviewed and stated in the chancellor's well-considered opinion, which we here, as to such part, adopt and quote as follows:

"In Kentucky, as at the common law, a lease for years is at once an estate and a contract and a liability for rent arises out of each of these 'privities,' so that the tenant is under an 'implied covenant' [to adopt the term used by Taylor in his work on 'Landlord and Tenant,' sec. 438] to pay rent, even though there is no express covenant to do so. In the absence of a controlling provision in the lease, the lessee may assign the leasehold, without the lessor's consent, just as he may transfer any other chattel. The assignment is good, as between assignor and assignee. But it does not follow that the lessee's liability for rent is thereby terminated. There is still a privity of contract between him and his lessor, even though there was no express covenant to pay rent. He cannot relieve himself of the liability resulting from this relationship without the concurrence of the landlord. The only difference appears to be that, where there is no covenant to pay rent, the lessor's consent will be implied from mere acquiescence, as, for example, by the acceptance of rent from the assignee, whereas, if there is an express covenant, the landlord's consent must be expressly given. Motch v. Portner, 237 Ky. 25, 34 S. W. [2d] 744.

"Some apparent inconsistency will be found in the cases and books with reference to this matter, and the statement is made occasionally that the liability for rent arising solely out of privity of estate may be terminated, even by the lessee, by an assignment to an irresponsible person, without the landlord's consent. Taylor, 'Landlord and Tenant,' sec. 371. It is admitted that this may be done by an assignee from the lessee, since there has never been any privity of contract between him and the lessor. Meyer Bros.' Assignee v. Gaertner, 106 Ky. 481, 50 S. W. 971, 21 Ky. Law Rep. 52, 45 L. R. A. 513. But as between lessor and lessee there is privity of contract, even though there be no express covenant to pay rent, and it is this that differentiates the rights of a lessee from those of an assignee, allowing the latter, but not the former, to throw off his liability for future rent by assignment to whom he pleases, without the acquiescence of the landlord. Tiffany, 'The Modern Law of Real Property,' sec. 46; annotation to Kanawha-Gauley Coal

& Coke Co. v. Sharp, 52 L. R. A. [N. S.] 968; Taylor, 'Landlord and Tenant,' sec. 438; 'The Rights, of Assignment and Underlease,' 7 Am. Law Rev.. 240.

In the present case the landlord has not acquiesced in the assignment made by the tenant, and, in addition, the tenant did covenant to pay taxes, insurance, and rent. It follows, therefore, that, if the tenant is to be exonerated from liability to make these payments, after the assignment, the justification must be found in the right to assign given by clause 16 of the lease. * * *

"The tenant did on June 20, 1932, assign the entire leasehold to the Mercantile Realty Company, a corporation organized for the purpose of taking the assignment. * * * The consideration paid for the assignment was $250.

"The record leaves no doubt that the assignee was wholly irresponsible and that the assignment was made for the sole purpose of escaping any further liability under the lease. * * *

"The position taken by the landlord is that the right given to the tenant by clause 16 to release itself from further liability by making an assignment to a person who would assume all of the covenants of the lease, by writing duly executed, acknowledged, and recorded in the county clerk's office, was a right which could be exercised only by an assignment to a person who could reasonably be expected to carry out the obligations assumed, and that consequently an assignment to a known irresponsible person did not release the tenant.

"The position taken by the tenant is that there has been a literal compliance with clause 16, and consequently it is released. It points out that there is no prayer for a reformation of the instrument and neither allegation nor proof of fraud or mistake which would authorize reformation, and says that consequently there is no justification for reading into the instrument a requirement, not found there, that an assignment could be made only to a responsible person.

"It is thus seen that the question to be decided is reduced to very narrow limits. It is whether or

not the requirement that the tenant's assignee shall formally assume all of the covenants of the lease has the implied meaning that the assignee shall not be incapable of making his promise good. * * *

"There can be no doubt that clause 16, if taken literally, does not qualify, in the manner claimed by the landlord, the right of the tenant to relieve itself from future liability by assignment of the leasehold. There has been a literal compliance with the terms of that clause, and the release of the tenant from further liability follows as a matter of course, unless the proper construction of that clause is that there was an implied condition that the release of the tenant would result only from an assignment to a responsible person. * * *"

Appellant contends that such implied condition must by construction, as a matter of law, be read into this clause 16 of the lease, in that otherwise there would result a failure to give it either meaning or effect. Appellant argues that Dr. Alexander's admitted purpose in the entire transaction was to secure income from a long-term investment, and that, under the lease, made with the intended object of securing such income, it was provided that it would be one of the considerations and conditions of the sale that the vendor would enter into a lease back of said property covering a period of 99 years.

Appellant argues that the lease assignment, here admittedly made to a known insolvent, was ineffectual to release lessee, for the reason that to hold valid such character of assignment as here made would result in defeating the clear intent and purpose of the parties, as expressed in their words employed in clause 16 of the lease, providing for its assignment. In support of appellant's contention that it would be thus violative of their intention expressed in this clause and render same meaningless, appellant states that for ascertaining the parties' intent we start with two conceded facts:, (1) That Dr. Alexander was seeking investment through a long-term lease; and (2) that the Theatre Realty Corporation offered to meet his requirement, through selling him a tract for $792,000 and then leasing the property back from him at a $44,000, etc., annual rental for 99 years.

The preliminary negotiations of the parties and

also Mr. Wirgman's letter of February 17, 1928, offering to make the lease, we are satisfied conclusively showed the parties' intention to do these two things, selling and leasing the land, as stated, but the argument that the ascertainment of their intention is confined to these two facts as wholly evidencing the intention of the parties ignores and overlooks a third dominant fact, potentialy evidential of the parties' intention, which is found in the provision of the lease requiring deposit by the tenant of $250,000 in securities as a guaranty for the performance of the lease covenants by the lessee and all subsequent tenants or assignees of the lease. This security for its performance was in its amount practically one-third of the price paid lessee for the lot, and not only was the lessee required to deposit with the trustee such an amount of security for the performance of the lease, but it was further required to maintain the security throughout the lease term in such amount or cash value by pledging such additional and approved securities with the trustee, whenever the value of those deposited might depreciate, as was sufficient to restore the deposited security to a market value of $250,000. Further, it is to be noted that, while the lessee was given —under the conditions named—the right to have the income from the deposited securities or to use the sale proceeds from a part or all of the securities for erecting suitable improvements upon the leased lot, only the amount of such securities as were actually used and applied to such improvement of the property were to be withdrawn from the trustee by the lessee, when the landlord was by clause 19 of the lease to have his lien given him upon the pledged securities transferred to the improvements constructed upon the lot with their sale proceeds, and which improvements so constructed, in case of the tenant's default in performing the lease, were, upon its termination by the landlord therefor, to become equally with any remaining unexpended security the absolute property of the landlord as liquidated damages.

It is easily to be conceived that, without this provision in the lease, requiring of any and all tenants, whether the lessee or later assignees, a deposit of $250,000 of securities forfeitable to the landlord as liquidated damages upon tenant's default in the performance of the lease covenants, it would reasonably appear that by clause 16 it was the intention of the parties, in order to

protect the lessor in the good-faith carrying out of the terms of the vendor's offer of sale of the property, made on the condition that vendor should receive a long-term lease from him, that equitable considerations might in such case require that lessee, in exercising the given right of assignment, should be confined to an assignment made in good faith to one apparently responsible or who could reasonably be expected to perform its covenants, and that such qualification upon the right to assign might have to be imposed by implication in construing the clause, to avoid a fraudulent overreaching of the landlord, buying the property upon the faith of substantially receiving from lessee in part consideration of his purchase, in fact as well as in form, such long-term lease promising a fixed income.

In such instance, appellant's claim that such qualification should be imposed upon a tenant's right of assignment as a matter of law, for the purpose of giving effect to what must needs have been in such case the intention of the parties, and also to prevent the lease from becoming unfairly "one-sided" or lacking in mutuality, might very justly merit our serious consideration. Clause 16 of the lease, without its further provision for the pledging of securities for its performance, would render the responsibility of the lessee or his subsequent assignee a matter of important concern to lessor, as otherwise the lessee might, under the provisions of clause 16, secure a long-term lease, which, while binding upon lessor, would only bind lessee for such period as he found operating under it profitable, when he might, through assignment, step from under its obligations when found no longer to his liking.

However, we do not conceive that situation or case, presenting such persuasive facts, to be the one here presented, or decided.

The evidence is here uncontroverted that Dr. Alexander, during his negotiations looking to his purchase and leasing back of this property, apparently took no thought as to who or what should be his lessee or his responsibility, but, on the other hand, relied for his protection in securing the performance of the lease, or its equivalent in value, upon his requirement that there should be not less than $250,000 deposited with the trustee to guarantee its performance. Such security given him therefor, under the general conditions existing at

the time the lease was made, he evidently felt amply secured for him yet another profitable experience with a long-term lease, regardless of who might be his tenant thereunder or what his or its financial condition might then or later prove to be, but was rather influenced and acted upon the principle that the pledged securities, or improvements into which converted, afforded and was safer security for performance of the lease covenants than the questionable responsibility of assignees. Under these circumstances, the provisions of clause 16, giving to his tenant, when not in default, the right to make assignment of the lease in the manner provided, and thereby terminate his personal liability thereunder, was not unusual or other than one which might have been reasonably intended by the parties. As tending to show that such was the attitude of Dr. Alexander, it is to be noted that the vendors, during their negotiations with him, changed their plans as to the corporation through which they would handle this sale and lease deal with him, without the change apparently exciting either comment by or concern in Dr. Alexander, nor does it appear that he even inquired as to who was to be his lessee, upon his purchase of the property.

The long-term lease here involved, its draftsman says, was drawn as a sound, ordinary, 99-year lease, and therefore the relative rights and liabilities of the parties to it must be gathered and determined according to the applicable and controlling common-law rules, adhering thereto.

Clause 16 of the lease provides, in case of an assignment of the entire leasehold, that the tenant should be released from further liability if any purchaser or assignee of the entire leasehold shall assume, "by writing duly executed, acknowledged, and recorded," all the covenants and obligations of the tenant then remaining unexecuted. It imposes no other qualification upon the right to assign, other than this manner of making it, for terminating the tenant's personal liability thereunder.

In 16 R. C. L. sec. 349, it is said:

"An assignee of the leasehold is in privity of estate with the lessor and is liable to him personally for a breach of the lessee's covenants which are annexed to and run with the leasehold and which are broken while he holds the leasehold estate, and though the assignment is by operation of law the assignee

takes subject to the general liabilities of a voluntary assignee.''

This statement of the rule was approved in the recent case of Consolidated Coach Corporation v. Consolidated Realty Company, 251 Ky. 614, 65 S. W. (2d) 724.

Further, in this same volume, _6 R. C. L. sec. 369, the rule as to the effect of an assignment of a lease is thus stated:

"If the reassignment is not colorable merely, the assignee may relieve himself from subsequently accruing liabilities, without regard to the intent with which the reassignment is made and irrespective of the financial condition of the person to whom the reassignment is made. As has been said, it is not a fraud upon the owner of the reversion, if the owner of the term assign it to another for the express purpose of terminating his future liability for rent, provided the conveyance is designed by both parties to divest the estate of the grantor and vest it in the grantee. There is no principle of law or morals which can require the termor to retain the term for the protection of the owner of the reversion, if he thinks it to his advantage to dispose of it, and it is not material if his grantee has no financial responsibility. * * *

"As regards the liability of the holder of a term after reassignment, it is immaterial that the reassignment was without a valuable consideration; if it was effectual to divest the assignee of the term, the lessor cannot complain. * * *''

Again to like effect was this rule declared by this court in Meyer Bros.' Assignee v. Gaertner, 106 Ky. 481, 50 S. W. 971, 972, 21 Ky. Law Rep. 52, 45 L. R. A. 513:

"What effect does an assignment over by the assignee of a term have upon his liability for rents to become due thereafter? The rule, in the absence of statutory modification, is thus stated by Taylor [volume 2, sec. 452] : 'An assignee always discharges himself from liability for subsequent breaches, in respect to rent as well as to other covenants, by assigning over, though it be done for the express purpose of getting rid of his responsibility, and although the second assignee neither takes possession

nor receives the lease. And he may assign to a beggar, a feme covert, or to a person who is on the eve of quitting the country forever, provided the assignment shall be executed before his departure, and even although the assignee may receive from the assignor a premium as an inducement to accept the transfer.' "

This court has thus stated that it is neither fraudulent nor wrong for an assignee to terminate privity of estate and thereby relieve himself of further liability by making a complete assignment of the leasehold. If such is the rule as to an assignee terminating privity of estate by assignment, why was the lessee here not entitled to likewise by assignment terminate its privity of estate with the lessor, and also, through making the assignment in the manner and form provided by the clause in question, to further terminate its privity of contract with lessor thereby, as being but the exercise of a right given him, under the conditions named in the clause, to release itself from all further personal or contract liability under the lease? We are of the opinion it could hardly be regarded as a fraud for the appellee to do a thing authorized by the lease for a purpose authorized by the lease.

The appellant does not here, in her attack on the lease, charge that its execution was secured by fraud or that the same should be reformed, but only insists that its clause 16 should be construed to impose by implication a qualification upon the lessee's right to make assignment of the lease—that it must be made in good faith to one believed reasonably capable of carrying out its covenants before lessee is to be released from its personal liability thereunder. But the clause in question does not grant the lessee the right of assignment upon such conditions or limitations, since it expressly authorized an assignment without any condition or qualification except that named, that the tenant should not be in default.

As said in the recent case of Yates v. Mammoth Cave National Park Association, 246 Ky. 524, 55 S. W. (2d) 348:

"There is no better established rule of law in this state than that a court cannot make a contract for the parties, but can only construe the contract it finds they have entered into. Nor has the court the

authority to read words into. a contract. Goff v. Blackburn, 221 Ky. 550, 299 S. W. 164; Fidelity & Casualty Co. of New York v. Waugh, 222 Ky. 198, 300 S. W. 592."

The Theatre Realty Corporation claims that it has absolved itself from further liability under the lease through the assignment made of it, contending that same was made. according to the terms of its lease contract.

We feel that it would unduly extend this opinion to here undertake to discuss the many authorities cited by appellant and distinguish them from the herein cited authorities by us deemed applicable and controlling of the question here presented.

For the reasons hereinabove stated, we conclude that the lease should not be given the construction sought by appellant, and therefore the judgment of the learned chancellor so holding being in harmony with our views, it is affirmed.

Whole court sitting, except Judge Clay.