## CINDERELLA THEATRE COMPANY, INC., v. UNITED DETROIT THEATRES CORPORATION.

1. LANDLORD AND TENANT—STATUTES—IMPLIED COVENANTS.
   The statutory provision against implying covenants applies to the lease of a theater (CL 1948, § 565.5).

2. COVENANTS—IMPLIED COVENANTS—STATUTES.
   The statutory provision that "no covenant shall be implied in any conveyance of real estate, except oil and gas leases," should not be so literally applied as to defeat the clear intent of the parties to an instrument as gathered from its context (CL 1948, § 565.5).

3. LANDLORD AND TENANT—CONSTRUCTION OF LEASE.
   Rule that leases are to be construed against the lessor and in favor of the lessee does not apply where latter drafted the instrument.

4. SAME—CONTRACTS—COURTS.
   A court cannot make a new contract for the parties to a lease.

5. SAME—CORPORATIONS—ASSIGNMENT OF LEASE.
   A corporate lessee may not assign its lessee interest under a 15-year lease to a wholly-owned, completely dominated, and insufficiently capitalized subsidiary corporation and thereby escape its existing liability under the lease.

6. CORPORATIONS—PARENT AND SUBSIDIARY.
   The corporate fiction will be disregarded where the parent corporation's domination of the subsidiary is so complete as to make them practically indistinguishable or to make the subsidiary a mere tool, agency, or instrumentality of the parent, so that the third party, dealing with the parent, will suffer loss unless the parent corporation be held.

---

REFERENCES FOR POINTS IN HEADNOTES
[2] 14 Am Jur, Covenants, Conditions and Restrictions § 14.
[3] 32 Am Jur, Landlord and Tenant § 128.
[4] 32 Am Jur, Landlord and Tenant § 127.
[5] 32 Am Jur, Landlord and Tenant § 356 et seq.
[6–8] 13 Am Jur, Corporations §§ 7, 8.
[12] 19 Am Jur, Estoppel §§ 83–86.

7. SAME—PARENT AND SUBSIDIARY—EVASION OF LEGAL OBLIGATIONS—SEPARATE ENTITIES—FRAUD.

The courts will disregard the separate corporate entity theory when a subsidiary corporation exists to evade the legal obligations of the parent corporation, without regard to actual fraud.

8. SAME—SEPARATE ENTITY—FRAUD.

Corporate separate existence will be disregarded where to recognize it would be to sanction a fraud or promote injustice.

9. ASSIGNMENTS—AGENT—EXISTING LIABILITY.

An assignment to a mere dummy or agent is not sufficient to relieve an assignor from an existing liability.

10. ACTION—SCOPE OF DECISION—VALIDITY OF ASSIGNMENTS.

A decision to set aside the assignment of 15-year lease of a theater property on the ground that that assignment is invalid does not call for decision as to validity of future assignments.

11. LANDLORD AND TENANT—ASSIGNMENT OF LEASE—ESTOPPEL.

Assignment of 15-year leasehold interest of theater to wholly-owned, completely dominated, and insufficiently capitalized subsidiary corporation that was organized with same officers as defendant corporate lessee is set aside notwithstanding claimed estoppel by cashing of first month's rent check, where it appears the lessee-assignor had remained in possession after the purported assignment and delay in return of deposit which lease required upon an assignment, and where defendant lessee had not been prejudiced by such conduct on the part of the lessor.

12. ESTOPPEL—PREJUDICE.

An estoppel does not exist unless the party claiming same was misled to its prejudice and acts are done in reliance upon conduct calculated to mislead.

Appeal from Wayne; Gilmore (Horace W.), J. Submitted April 3, 1962. (Docket No. 3, Calendar No. 49,353.)   Decided September 7, 1962.

Bill by Cinderella Theatre Company, Inc., a Delaware corporation, against United Detroit Theatres Corporation and Pontiac Theatre Corporation, both Michigan corporations, to invalidate assignment of lease and to determine liability of original lessee. Decree for plaintiff. Defendants appeal. Affirmed.

*Crawford, Sweeny, Dodd & Kerr (Robert G. Rus-*

*sell, Richard H. May,* and *Harry M. Nayer,* of counsel), for plaintiff.

*Butzel, Eaman, Long, Gust & Kennedy (Rockwell T. Gust, David A. Howell,* and *James D. Ritchie,* of counsel), for defendants.

Kelly, J. This is an appeal from a decree which set aside an assignment of a lease by defendant United Detroit Theatres Corporation (UDT), lessee, to defendant Pontiac Theatre Corporation (Pontiac), and provided that plaintiff (Cinderella), lessor, should recover from the assignor UDT the unpaid rental instalments accruing after the assignment up to the date of the decree.

August 5, 1937, a 15-year lease was entered into between plaintiff and UDT for the Cinderella Theatre, which is located on the east side of Detroit, and on July 30, 1952, the lease in suit was entered into by plaintiff Cinderella and defendant UDT for a 15-year term commencing at the expiration of the first lease and extending to August 31, 1967, at a total rental of $589,995, to be paid at the rate of $3,277.75 per month.

Twenty-eight days after the effective date of the current lease, namely September 29, 1952, Pontiac was incorporated by an officer and by a director of UDT, and on October 7, 1952, UDT became the sole stockholder in Pontiac. On that same day the board of directors of Pontiac authorized its officers to enter into an agreement with UDT whereby Pontiac would take over the current Cinderella Theatre lease.

Between the 1952 incorporation of Pontiac and November 8, 1958, when UDT assigned this lease to Pontiac, Pontiac remained dormant and UDT operated the Cinderella Theatre at a loss, with losses particularly heavy in the 2 years preceding the assignment.

During the summer of 1958 the officers and directors of UDT decided to bring to an end Cinderella's loss by assigning the lease to Pontiac. Plaintiff's president, being advised of this fact, notified UDT that an assignment to a dummy corporation would not be recognized, and UDT responded by its letter of August 27, 1958, stating:

"Our attorneys have informed me that the language of the lease, and of article 14 in particular, makes no requirement that we assign to a financially sound assignee and further, that this article does not prohibit the assigning of the lease to a 'so-called' dummy corporation."

Article 14 of the lease, entitled "Right of assignment" provides as follows:

"It is further expressly understood and agreed that no assignment or conveyance of this lease or the leasehold estate hereby created may be made by the lessee unless and until the lessee shall have first deposited with the lessor as advance rent the further sum of $39,333, which said deposit shall be applied to the payment of the rental accruing under this lease during the last 12 months of the 15th year of the term hereof, and unless the assignee shall assume and agree to perform all of the covenants and conditions of this lease on the part of the lessee to be performed. Upon said additional deposit in this article provided for being made, and notice given by the lessee to the lessor of such assignment accompanied by a copy of the document of assignment and assumption, the lessee, United Detroit Theatres Corporation, shall automatically be relieved and released from each and every of the covenants in this lease contained.

"It is further expressly understood and agreed that if and in the event, after said additional deposit of $39,333 provided for in this article is made, this lease be terminated by the lessor by reason of default on the part of the lessee or its assignee in the pay-

ment of the rental hereinabove reserved and agreed to be paid, or by reason of the default of the lessee or its assignee in the observance or performance of any other covenant or condition of this lease on the part of the lessee or its assignee, then and in such event said sum of $39,333 deposited with the lessor pursuant to the provisions of this article shall also belong to and be kept and retained by the lessor free and discharged of any and all claims, rights or interest of the lessee and its assignee therein and thereto and as and for liquidated damages of the lessor occasioned by such default on the part of the lessee or its assignee."

November 6, 1958, UDT forwarded to plaintiff its certified check in the sum of $39,333, and on November 8, 1958, UDT notified plaintiff that the assignment had been effected to its wholly owned subsidiary, Pontiac, and enclosed a copy of the instrument of assignment and assumption.

After the assignment Pontiac paid the rent for the first month, but on January 7, 1959, Pontiac notified plaintiff that it could not meet the tax payments due on January 15, 1959, nor could it pay the January rental. No rent payment other than December, 1958, has ever been made.

May 15, 1959, appellee commenced this present suit against UDT and Pontiac, and tendered back to UDT the check for $39,333 that UDT had forwarded to plaintiff.

The court, in finding for plaintiff, stated that article 14 called not only for payment of $39,333 but, also, called for an agreement by the assignee to assume all the conditions of the lease; that if the parties wished to provide for termination by payment of liquidated damages they could have done so, but they went beyond that; that UDT for all intents and purposes did not assign to anyone because it assigned to Pontiac, set up for the sole purpose of re-

ceiving the assignment; that Pontiac was not capitalized in any way that would indicate a good-faith intention to operate the theater; that Pontiac exercised no independent judgment of officers; that there was no severability between the 2 corporations and Pontiac was clearly and completely an instrumentality or another portion of UDT; that this was merely an assignment by UDT to itself; and the court concluded this general thought by saying:

"I cannot conceive of Pontiac being anything but the tool, instrumentality and agency of the parent and it is my opinion that is not what was intended by the writers of article 14, and, therefore, I think the plaintiff is entitled to relief with respect to this assignment and the court will enter a decree setting aside this assignment."

Appellants contend that article 14, which is silent regarding the qualifications of a prospective assignee, cannot be construed to require that such assignee be an independent corporation capable of performing the covenants of the lease and that "arriving at a contrary conclusion, the lower court (1) ignored the Michigan statute (CL 1948, § 565.5 [Stat Ann 1953 Rev § 26.524]) which provides: 'No covenant shall be implied in any conveyance of real estate, except oil and gas leases'; (2) construed the lease in plaintiff's (*lessor's*) favor, thereby disregarding the well-settled Michigan rule that the provisions of a lease are to be construed *against the lessor,* and *in favor of the lessee* * * * ; and (3) disregarded the *Alexander Case* (*Alexander* v. *Theatre Realty Corporation,* 253 Ky 674 [70 SW2d 380])."

In re appellants' reference to the statute providing "No covenant shall be implied in any conveyance of real estate, except oil and gas leases," we agree that this provision would apply to the present lease.

*Minnis* v. *Newbro-Gallogly Co.*, 174 Mich 635 (44 LRA NS 1110). This statutory prohibition, however, should not be so literally applied as to defeat the clear intent of the parties as gathered from the context of the instrument. *Real Estate Stores, Inc.*, v. *Harris*, 321 Mich 623.

As to appellants' claim that the court "construed the lease in plaintiff's (lessor's) favor, thereby disregarding the well-settled Michigan rule that the provisions of a lease are to be construed against the lessor, and in favor of the lessee," appellee answers by stating that the legal department of Paramount Pictures prepared the lease and drafted same without any provision for its voluntary termination and to this statement appellants answer by stating that while Paramount presumably acted for appellants, yet Paramount only copied article 14 from the previous lease.

Considering appellants' claim that the court erred in disregarding the case of *Alexander* v. *Theatre Realty Corporation, supra,* we quote the syllabi in that case:

"Tenant cannot by assignment of lease relieve himself of liabilty resulting from privity of contract.

"Provision in 99-year lease for tenant's release from liability thereunder in case of assignment and assignee's assumption of lease covenants permitted tenant to obtain release by assigning leasehold to corporation which tenant knew was insolvent, where lease further required maintenance by tenant of deposit in amount aggregating almost 1/3 of price paid for leased premises.

"The evidence disclosed that the lessor had purchased the lots for $792,000, and that he apparently took no thought as to who should be his lessee or as to lessee's responsibility, but relied for his protection on provision of lease requiring $250,000 deposit by tenant to guarantee its performance. The lease not only required deposit of this amount, but

maintenance thereof through the lease term and pledging of additional securities in case of depreciation in value of those deposited.

"Court cannot read additional words into contract, but must construe contract as made."

The lease and the facts presented to the Kentucky court differ from the present lease and facts, as is evidenced by the following from the Kentucky opinion (pp 685, 686):

"It is easily to be conceived that, without this provision in the lease, requiring of any and all tenants, whether the lessee or later assignees, a deposit of $250,000 of securities forfeitable to the landlord as liquidated damages upon tenant's default in the performance of the lease covenants, it would reasonably appear that by clause 16 it was the intention of the parties, in order to protect the lessor in the good-faith carrying out of the terms of the vendor's offer of sale of the property, made on the condition that vendor should receive a long-term lease from him, that equitable considerations might in such case require that lessee, in exercising the given right of assignment, should be confined to an assignment made in good faith to one apparently responsible or who could reasonably be expected to perform its covenants, and that such qualification upon the right to assign might have to be imposed by implication in construing the clause, to avoid a fraudulent over-reaching of the landlord, buying the property upon the faith of substantially receiving from lessee in part consideration of his purchase, in fact as well as in form, such long-term lease promising a fixed income.

"In such instance, appellant's claim that such qualification should be imposed upon a tenant's right of assignment as a matter of law, for the purpose of giving effect to what must needs have been in such case the intention of the parties, and also to prevent the lease from becoming unfairly 'one-sided' or lacking in mutuality, might very justly merit our serious

consideration. Clause 16 of the lease, without its further provision for the pledging of securities for its performance, would render the responsibility of the lessee or his subsequent assignee a matter of important concern to lessor, as otherwise the lessee might, under the provisions of clause 16, secure a long-term lease, which, while binding upon lessor, would only bind lessee for such period as he found operating under it profitable, when he might, through assignment, step from under its obligations when found no longer to his liking.

"However, we do not conceive that situation or case, presenting such persuasive facts, to be the one here presented, or decided."

In addition to the *Alexander Case,* appellants emphasize *Ramey* v. *Koons* (CCA 5), 230 F2d 802, stating the court erred in not following this decision which also holds that a trial court cannot make a new contract for the parties.

The *Ramey Case, supra,* was an appeal from an order of the United States district court, southern district of Florida, where it was held that where the lease agreement was complete and unambiguous, parol evidence to supplement it was inadmissible; that the assignment was not shown to be fraudulent, and that no fraud was committed by incorporating the corporation as assignee of the lease for the precise purpose of avoiding liability by the lessee.

The portion of the lease in question in the *Ramey Case* was paragraph 13, which read:

"It is understood that the tenant will assign this lease and upon such assignment and the assumption by assignee of the obligations hereunder, the tenant shall be released from all obligations hereunder."

In the opinion on appeal, the court stated (pp 805, 806):

"The appellant pleads that the lessee, Charles A. Koons, expressly represented that the assignment

of the lease would be to a responsible corporation with substantial assets, but that the assignment was to an irresponsible corporation without assets. This, the appellant urges to be fraud.  *  *  *

"In a somewhat different approach the appellant urges that the assignment is fraudulent because the corporate assignee is a 'straw', the alter ego of the appellee, Charles A. Koons, and that the assignment was made for the purpose of relieving Koons and his partnership from liability on the lease. As a guide toward a decision on this question, we look to the Florida supreme court and find the following:

" 'The law is well settled that the organization of a corporation for the purpose of evading an existing personal liability on the part of those who became its stockholders will not be allowed to achieve that purpose, for in such case the courts will "pierce the veil of the corporate fiction" and hold the stockholders of the corporation to their personal liability, even though the corporation was regularly organized in accordance with the statutes. Not that the law deems it reprehensible to form a corporation in order to limit one's risk to the amount of his investment in the stock, so far as future liabilities of the corporation are concerned; for this is legitimate and an every day occurrence.

" 'Thus Prof. Wormser, in the book referred to [The Disregard of the Corporate Fiction and Allied Corporate Problems] (p 18), says:

" ' "Such a decision is entirely correct, because, if the corporation has been validly organized in its inception, the use of the corporation to prevent the incurring of personal obligations in the future is entirely proper and legitimate. The policy of our law today sanctions incorporation with the consequent immunity from individual liability. It follows that no fraud is committed in incorporating for the precise purpose of avoiding and escaping personal responsibility. Indeed, that is exactly why most people incorporate, and those dealing with corporations know, or at least are presumed to know, the

law in this regard." ' *Bellaire Securities Corporation* v. *Brown,* 124 Fla 47, 68, 69 (168 So 625, 633).

"In the case before us the parties agreed that the tenant would assign the lease and upon the assumption of its obligations by the assignee the tenant would be released. As said in the foregoing quotation from Professor Wormser, ' "no fraud is committed in incorporating for the precise purpose of avoiding and escaping personal responsibility" '. To hold otherwise 'would completely destroy the corporate entity as a method of doing business and it would ignore the historical justification for the corporate enterprise system'. *Advertects, Inc.,* v. *Sawyer Industries* (Fla), 84 So 2d 21, 23, 24."

While we agree with appellants that the *Alexander* and *Ramey Cases* held that a court cannot make a new contract for the parties, yet the *Ramey* lease differs so definitely from the Cinderella lease that we disagree with appellants that *Alexander* and *Ramey* fully support appellants' position. The *Ramey Case* did not deal with incorporating for the purpose of avoiding a present and existing liability but involved incorporating for the purpose of escaping future personal responsibility. Further, the *Alexander* and *Ramey Cases* did not deal with a situation where the assignor remained in possession and control after the assignment, and appellee contends:

"By creating Pontiac with insufficient capital to operate as a business and by maintaining complete and absolute control over its activities, UDT has sought to avoid the burdens of the lease and yet retain its benefits. In effect, Pontiac is but an assumed name under which UDT is and has been operating the Cinderella Theatre,"

and to sustain such conclusion, appellee calls attention that the record before us proves that:

(1) "Prior to November 8, 1958, Pontiac not only agreed to accept the assignment of the lease but also

entered into an oral management agreement with the UDT, by the terms of which UDT was to supervise the buying and booking of films at the Cinderella, was to handle finances, advertising, maintenance, and take care of accounting and auditing";

(2) "The assignment in question was executed on behalf of Pontiac and UDT by Mr. Harold Brown and Mr. E. J. Welling who held identical positions in both corporations. The instructions that Mr. E. J. Welling received with respect to the assignment as an officer of UDT in no way differed from the instructions he received with respect to the assignment as an officer of Pontiac";

(3) "From the date of assignment until the date of trial, no salaries were paid by Pontiac to any of its officers";

(4) "Films which are exhibited in the Cinderella Theatre are booked and purchased by Mr. Thomas Beyerly who is an employee of UDT, and is paid by UDT and not by Pontiac. All contracts entered into by the Cinderella Theatre are signed by Woodrow Praught, president of both UDT and Pontiac. However, Mr. Praught receives no salary from Pontiac";

(5) "Price-Waterhouse performs auditing services for the Cinderella Theatre and is paid therefor by UDT, not Pontiac";

(6) "Nearly 1 year after the assignment, in October of 1959, the stationery of UDT still listed the Cinderella as 1 of its theaters. In addition, UDT listed the Cinderella Theatre as one of its theaters in gift books sold to the public, and the uniforms of the ushers of the Cinderella Theatre in April of 1961 bore the insignia 'U.D.T.' ";

(7) "In a press release prepared by UDT and submitted to the Detroit newspapers in February of 1959 when Mr. Praught was appointed president of UDT, the Cinderella was listed as a UDT theater."

Appellants complain in regard to "The trial court's reliance on *Herman* v. *Mobile Homes,* 317 Mich 233."

The court's reference to that case in its opinion is as follows:

"Plaintiff relies, however, upon the fairly recent case in Michigan, *Herman* v. *Mobile Homes,* 317 Mich 233, which discusses the rights and duties between corporations and their subsidiaries when dealing with third persons, and it cites as significant in the interpretation of article 14 the language quoted with approval by the court of Mr. Justice Cardozo on page 245 where he says:

" 'Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent.   Where control is less than this, we are remitted to the tests of honesty and justice.   *   *   * The logical consistency of a juridical conception will indeed be sacrificed at times when the sacrifice is essential to the end that some accepted public policy may be defended or upheld.   This is so, for illustration, though agency in any proper sense is lacking, where the attempted separation between parent and subsidiary will work a fraud upon the law (citing cases).   At such times unity is ascribed to parts which, at least for many purposes, retain an independent life, for the reason that only thus can we overcome a perversion of the privilege to do business in a corporate form."[1]

"Also from that opinion, on page 246, the quotation with approval from the Tennessee case, where the court said:

" 'It is not necessary for one to show that he has been misled, deceived or actually defrauded, to enable him to invoke this rule.   It is enough that the parent corporation's domination of the subsidiary was so complete as to make them practically indistinguishable or to make the subsidiary a mere tool,

---

[1] From *Berkey* v. *Third Avenue R. Co.,* 244 NY 84, 95 (155 NE 58, 50 ALR 599).—Reporter.

agency or instrumentality of the parent; and that he will suffer loss unless the parent be held."[2]   *   *   *

"This was merely an assignment, as far as the court can see, by United Detroit Theatres to itself, or an attempted assignment, and as such it does not in my opinion comply with the language of article 14 and I think it comes within the language of the *Herman Case,* 246, which I have just quoted, where it says it is not necessary to show that one has been misled, deceived or actually defrauded to invoke the rule. It is enough that the parent corporation's domination of the subsidiary is so complete as to make the subsidiary a mere tool, agency or instrumentality of the parent, and I cannot conceive of Pontiac being anything but the tool, instrumentality and agency of the parent and it is my opinion that is not what was intended by the writers of article 14, and, therefore, I think the plaintiff is entitled to relief with respect to this assignment and the court will enter a decree setting aside this assignment."

Appellants' objection to the court's consideration of the principles of law in the *Herman Case* are as follows:

"In the *Herman Case,* the plaintiff had certain dealings with a subsidiary and it was held that such subsidiary was the agent of its parent and that the parent was liable under the principles of agency. *   *   *   Plaintiff's dealings were with UDT, the parent corporation, and not with Pontiac, the subsidiary. The alleged liability of UDT to plaintiff in no way arises from its relationship as the parent of Pontiac—it arises, if at all, under the lease agreement."

We agree with appellants that in the *Herman Case* plaintiff dealt with a subsidiary and that the transaction in the present appeal arises under the lease agreement between UDT and Cinderella. We do not

---

[2] From *Tennessee Consol. Coal Co.* v. *Howe Ice & Coal Co.,* 25 Tenn App 316, 321 (156 SW2d 454, 458).—REPORTER.

conclude, however, that the court was misled by considering the principle enunciated in *Herman,* namely "Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent."

*People, ex. rel. Attorney General,* v. *Michigan Bell Telephone Co.,* 246 Mich 198 (PUR 1929B, 455, PUR 1929E, 27), involves a quo warranto proceeding by the attorney general to oust a telephone company. The proofs disclose that defendant was only an instrumentality of a foreign corporation in conducting its business, and this Court in deciding that a judgment of limited ouster would be entered, stated (pp 204, 205):

"Where a corporation is so organized and controlled and its affairs so conducted as to make it a mere instrumentality or agent or adjunct of another corporation, its separate existence as a distinct corporate entity will be ignored and the 2 corporations will be regarded in legal contemplation as 1 unit. *In re Muncie Pulp Co.* (CCA 2), 139 F 546; *Interstate Telegraph Co.* v. *B. & O. Telegraph Co.* (D Md), 51 F 49; Wormser on Disregard of the Corporate Fiction, p 54. When a corporation exists as a device to evade legal obligations, the courts, without regard to actual fraud, will disregard the entity theory. *Higgins* v. *California Petroleum & Asphalt Company,* 147 Cal 363 (81 P 1070); *Brundred* v. *Rice,* 49 Ohio St 640 (32 NE 169, 34 Am St Rep 589); *Donovan* v. *Purtell,* 216 Ill 629 (75 NE 334, 1 LRA NS 176).

"That the Michigan company is a mere agent or instrumentality of the American company is established. We think that it is also apparent that a purpose of the separate entity is to avoid full investigation and control by the public utilities commission of the State to the injury of the public. The difference in entity going out, the contract goes with

it.   The American company cannot contract with itself."

Appellants state: "The reasoning of the Court in *Gledhill* (*Gledhill* v. *Fisher & Co.,* 272 Mich 353 [102 ALR 1042]) is applicable here and would require a like holding of *nonliability* of the parent corporation, UDT," and quote from said decision as follows (pp 359, 360):

"The organization of a corporation for the avowed purpose of avoiding personal responsibility does not in itself constitute fraud justifying the disregard of the corporate entity.   In *Elenkrieg* v. *Siebrecht,* 238 NY 254, 261, 262 (114 NE 519, 34 ALR 592), the court stated:

" 'Whether or not the corporation is the creature of Siebrecht is not a determining feature.   Whether it be a subterfuge is misleading.   Many a man incorporates his business or his property and is the dominant and controlling feature of the corporation. He may do so for the very purpose of escaping personal liability.'

"Wormser, in his 'Disregard of the Corporate Fiction and Allied Corporate Problems,' goes far in holding a parent corporation liable for the debts of its subsidiary where the latter is formed for a fraudulent purpose, but he distinctly limits the rule as follows (p 18):

" 'It follows that no fraud is committed in incorporating for the precise purpose of avoiding and escaping personal responsibility.   Indeed, that is exactly why most people incorporate, and those dealing with corporations know, or at least are presumed to know, the law in this regard.' "

In disagreeing with appellants that this case is "applicable here and would require a like holding of *nonliability,*" we quote further from *Gledhill* v. *Fisher & Co., supra,* as follows (pp 360, 361, 364):

"A subsidiary may be formed for the very reason that prompts individuals to form corporations, to protect themselves from personal liability, to make only its capital liable, to say to those that deal with it, 'here is the amount of our capital stock; we are a *bona fide* corporation organized for legitimate purposes and doing business in a legal manner. If you want to deal with us on the basis of our liability as shown by our capital set up, you may do so, and if not, you may refrain from so doing.' There was no fraud in the purchase of the property by the subsidiary without disclosing the ownership of its capital stock. The record does not show that any reliance was placed on who the purchasers were. It was a time when there was a tremendous inflation in real estate, as evidenced by the many cases that have reached this court. The depression and accompanying deflation in values were not foreseen. Plaintiffs and their vendee agreed upon a price. Plaintiffs knew or should have known that they could only look to the corporation vendee, or the property in the event of a default. A large down payment was made, the depression came, plaintiffs took back their property and retained all that had been paid on it by vendees.  * * *

"At the time the contract was entered into, no inquiry was made as to who constituted the incorporators of the defendant corporation. Plaintiffs dealt with the corporation just as they would have dealt with any other company in reliance upon the capital stock of the purchasing company and the inherent value of the real estate itself. There is no proof in this case that the defendant (subsidiary) corporation was in any way the agent or tool of the corporation which controlled its capital stock, or that it was not a corporation organized in good faith to pay for, acquire and hold the property purchased."

. The supreme court of California in 1939 heard and considered an assignment of a lease by a financially responsible corporation owned by father and son, to

a corporation which had no assets and owned by the son and his wife (*Shea* v. *Leonis,* 14 Cal 2d 666 [96 P2d 332]). In deciding that the rule that the lessee can relieve himself of liability for rent by making an assignment even though the assignee is insolvent would not control or apply, the court stated (p 669):

"The stockholders of the corporation assignee, * * * while enjoying the benefits of the lease, cannot equitably claim that they may escape its burdens through the device of taking the assignment of lease in the name of a corporation which is without other assets and has been organized by them for the purpose of taking such an assignment.

" 'Corporate separate existence will be disregarded where to recognize it would be to sanction a fraud or promote injustice. * * *

" 'It may be said in addition that the assignment is, in effect, as plaintiffs allege, no assignment at all and that the new corporation is but the old one under another name. An assignee cannot escape liability by an assignment which is merely colorable. (1 Tiffany, Real Property [2d ed] 184; 16 RCL, Landlord and Tenant, § 369, p 866.)' "

An assignment to a mere dummy or agent was declared not sufficient to relieve defendant of liability by the appellate division of the New York supreme court in *Century Holding Co.* v. *Ebling Brewing Co.,* 185 App Div 292 (173 NYS 49). There the court said (p 299):

"If, however, Sudbrink (assignee) was the mere agent or dummy of the defendant (assignor), and if the defendant intended to remain in possession, keeping control of the property, * * * which assumptions are amply sustained by the evidence, it certainly cannot be said that there was any *bona fide* transfer of the lease to Sudbrink which would relieve defendant from its liability to pay rent to the plain-

tiff. The circumstances surrounding the transfer of the lease are more than suspicious and were sufficient to warrant the jury in finding that Sudbrink was a mere agent or dummy of the defendant. If this be true, the defendant could not rid itself of liability by such assignment."

We call attention to 16 RCL, Landlord and Tenant, § 369, which was quoted with approval in appellants' cited case of *Alexander* v. *Theatre Realty Corporation, supra,* 688, as follows:

"If the reassignment is not colorable merely, the assignee may relieve himself from subsequently accruing liabilities, without regard to the intent with which the reassignment is made and irrespective of the financial condition of the person to whom the reassignment is made."

Appellee claims that Pontiac was "formed for the express purpose of receiving an assignment and compelling termination of the lease." This claim is considered along with the fact that Messrs. Brown and Welling held identical positions in UDT and Pontiac, that the assignment was executed by both of them, and the following from the cross-examination of Mr. Welling:

"*Q.* What were the gross receipts for the period commencing November 8, 1958, and ending at the end of November, the last day of November?

"*A.* This indicates that receipts for the 2 weeks ending November 25th amounted to $5,105.10.

"*Q.* What were the receipts for the month of December?

"A. For the 5 weeks ending December 30th they were $10,192.51.

"*Q.* Could you give them to me for the month of January?

"*A.* Theater receipts for the 4 weeks ending January 27, 1959, amounted to $10,348.69.

"*Q.* Mr. Welling, what is the amount of the monthly rent of the Cinderella?

"*The Court:* $3,277.75, according to article 1 of the lease.  O.K.  $3,277.

"*Q.* Were the total receipts that were received by Pontiac from the operation of the Cinderella in November of 1958 were the five thousand some odd dollar figure that you read, is that correct?

"*A.* That is right.

"*Q.* And from that figure Pontiac was able to pay 1 month's rent?

"*A.* Yes.

"*Q.* If I understand you correctly the receipts for the next 2 months were ten thousand some odd dollars each month; that would be December and January?

"*A.* Yes.  * * *

"*Q.* As an officer of Pontiac, did you ever receive any orders or instructions as to what bills you should or should not pay for Pontiac?

"*A.* Yes.

"*Q.* Those instructions relate to rent?

"*A.* Yes.

"*Q.* What were those instructions?

"*A.* To pay all of our bills before we paid the rent.

"*The Court:* When were those instructions given to you?

"*A.* Approximately the time of the assignment.

"*The Court:* And from whom?

"*A.* I received my instructions from Mr. Brown.

"*Q.* Were those instructions given to you before or after the assignment?

"*A.* After the assignment, as I recall it.  * * *

"*Q.* Did you receive any specific instructions or orders with respect to the taxes that were due?

"*A.* Yes, at the time that telegram was sent.

"*Q.* You were instructed not to pay the taxes?

"*A.* Yes.

"*Q.* By whom were you instructed?

"*A.* Mr. Brown."

The trial court stated that his decision should be based on the validity of the assignment and that he was not called upon to decide any future assignments. We agree with the trial court.

The construction of article 14 neither involves an application of the parol evidence rule, nor the statute prohibiting covenants by implication, and we agree with the trial court's finding that:

"I cannot conceive of Pontiac being anything but the tool, instrumentality and agency of the parent and it is my opinion that is not what was intended by the writers of article 14, and, therefore, I think the plaintiff is entitled to relief with respect to this assignment and the court will enter a decree setting aside this assignment."

The record proves that the assignment was merely "colorable" and the court did not err in finding that the purported assignor, UDT, had remained in possession after the purported assignment.

We conclude by stating that we see no merit to appellants' claim that plaintiff was estopped to deny the validity of the assignment by reason of cashing the first month's rent check and in delaying the return of the deposit check for $39,333.

This court has repeatedly held that estoppel does not exist unless the party claiming same was misled to its prejudice and acts are done in reliance upon conduct calculated to mislead. *Odgers* v. *Lentz,* 319 Mich 502, and *Cudahy Brothers Co.* v. *West Michigan Dock & Market Corp.,* 285 Mich 18.

Appellants offered no evidence or testimony on the estoppel issue and the record does not disclose that appellants were prejudiced by the conduct of the appellee.

Affirmed. Costs to appellee.

Carr, C. J., and Dethmers, Black, Kavanagh, Souris, Otis M. Smith, and Adams, JJ., concurred.