**SHADELAND DEVELOPMENT CORP. and Holiday Inns, Inc., Appellants (Defendants Below),**

v.

**Mary R. MEEK and J. Perry Meek Realty Co., Inc., Appellees (Plaintiffs Below).**

No. 4–1084A289.

Court of Appeals of Indiana, Fourth District.

March 10, 1986.

Rehearing Denied April 23, 1986.

Michael R. Fruehwald, Barnes & Thornburg, Indianapolis, for appellants.

John F. Wickes, Jr. Patricia Polis McCrory, Scopelitis & Garvin, Indianapolis, for appellees.

MILLER, Judge.

Plaintiffs-appellees Mary R. Meek and J. Perry Meek Realty Co., Inc. (the Meeks) brought suit against defendants-appellants Shadeland Development Corp. and Holiday Inns, Inc., claiming damages arising from an alleged breach of a 60 year lease of commercial/motel property in Indianapolis, Indiana. The Meeks were owner-lessors of the property. Shadeland was a tenant under the lease but transferred its interest in the lease to another company, San Antonio Inns, Inc., which subsequently defaulted in rent payments. The Meeks alleged that the assignment of the lease by Shadeland was a breach of the lease, was ineffective to release Shadeland from liability, and was tortious (assignment of a lease to an insolvent assignee). Holiday Inns, owner of the stock of Shadeland, was alleged to be liable for the debts of its subsidiary.

Both sides moved for summary judgment. The trial court denied the motion of Shadeland and Holiday Inns, and granted the Meeks' motion as to liability, certifying the liability determination as a final judgment under Ind. Rules of Procedure, Trial Rule 56(C). Shadeland and Holiday Inns now appeal the denial of their summary judgment and the granting of the Meeks' motion. We address the following issues:

1. Does the lease give Shadeland the right to assign?

2. Was the lease effectively assigned to San Antonio so as to release Shadeland from liability?

3. Did Shadeland have a duty to exercise reasonable care in the assignment of the lease?

4. Is Holiday Inns liable as the parent corporation of Shadeland?

We reverse. We find the clear and unambiguous language of the lease permitted Shadeland to assign, the assignment to San Antonio was full, complete and unconditional, and the lease did not obligate Shadeland to guaranty a solvent assignee.

### FACTS

This action arises from a lease, dated June 15, 1960 between the Meeks as lessors and "Fred C. Tucker, Jr. Agent and upon assignment his nominee," as lessee. Tucker was an agent for an Indiana corporation to be formed by Tucker and others. As named lessee he was to assign his interest to the corporation which was to assume the lease and all obligations thereunder.

Tucker assigned his interest in the lease to 1920 North Meridian Corporation on September 6, 1960. Sometime in the early 1960's, a motel building was constructed as required by the lease and a motel operation was commenced.

Shadeland was incorporated as an Indiana corporation on March 8, 1962. 1920 North Meridian subsequently merged with Shadeland on March 30, 1970, with Shadeland emerging as the surviving corpora-

tion. On December 18, 1970, Holiday Inns acquired all the shares of Shadeland in exchange for Holiday Inns' stock.

On July 22, 1977 Shadeland assigned the lease to Key Host Inn of Indianapolis, Inc., Robert Weber, President, for $100,000.00 plus the assumption of the company's leases. Holiday Inns loaned Key Host the funds to pay for the transfer of the property from Shadeland to Key Host.

Some financial difficulties arose and Key Host was in default approximately one month later on October 13, 1977. A "resettlement statement" was worked out between Shadeland and Weber whereby Shadeland, as assignor, entered into an assignment of the lease with San Antonio Inns, Inc. as assignee. Weber signed as guarantor for San Antonio. At the time of assignment Holiday Inns loaned money to San Antonio to assist in financing the consideration paid by San Antonio to Shadeland. The debt of San Antonio to Holiday Inns was paid within a year, and on September 6, 1978 the assignment was recorded in the office of the Marion County Recorder. Thereafter, San Antonio paid rent directly to the Meeks.

After October 13, 1977, San Antonio operated a motel on the leased premises. San Antonio vacated the premises in July, 1980 and no rent was paid to the Meeks after September 1980. The Meeks brought suit for damages based upon approximately $14,000 in back rent, the rent due on the remaining term of nearly 40 years, real estate taxes and attorney fees.

## DECISION

It is a general rule that the intention of the parties to a contract is to be determined from the "four corners" of the document. *Shrum v. Dalton* (1982), Ind.App., 442 N.E.2d 366. Absent any ambiguity, the court will not construe the contract. *Reeder v. Ramsey* (1984), Ind.App., 458 N.E.2d 682. Rather, where the terms of the contract are plain and clear on the face of the document, such terms are conclusive as to the meaning of the contract and the court will apply the contract's provisions according to the plain language of the document. *Young v. Van Zandt* (1983), Ind.App., 449 N.E.2d 300, 307. Thus, we focus on the language found in the lease contract between Shadeland and the Meeks.

### I. *Shadeland's right to assign the lease*

Shadeland urged in summary judgment proceedings that the lease expressly extended a free right of assignment to 1920 North Meridian Corporation, the nominee corporation referred to in the lease. In opposing Shadeland's motion for summary judgment the Meeks argued the right of assignment in the lease was limited to the right of Fred C. Tucker, Jr. to assign to the nominee corporation and no other assignment without consent was allowed. The trial court agreed with the Meeks' position and made specific findings to the effect:

"30. The unfettered right to assignment of the Lease only extended to Fred C. Tucker, Jr., Agent, and the initial assignment to his nominee corporation, *i.e.* 1920 North Meridian Corporation, and not in subsequent or successor lessees. (*Mary R. Meek Affidavit;* and *John P. Meek Affidavit*).

31. It was the understanding and intention of the parties at the time this Lease was executed that the free right of assignment to this Lease existed only in Fred C. Tucker, Jr., Agent, and pertained only to the assignment of his interest in the Lease to his nominee corporation, 1920 North Meridian Corporation. (*Mary R. Meek and John P. Meek Affidavits*).

32. It was the understanding and intention of the parties at the time this Lease was executed that this initial assignment was to be between persons with an interest and residency in Indianapolis, Indiana, and that subsequent assignments would have to be approved by the Lessors in order to be effective. Further, it was the understanding of the Lessors that subsequent assignments would not be effective unless there was a novation on their part or new and additional consideration tendered to them for such as-

signment. (*Mary R. Meek and John P. Meek Affidavits*)."

The court also made the following conclusion:

"27. The approval of Plaintiffs, Lessors, to any assignment subsequent to the initial assignment with Fred C. Tucker, Jr., Agent, to his nominee corporation was required."

On appeal, the Meeks now concede that the position urged by them below and adopted by the trial court was erroneous:

"[T]he Meeks do not dispute Appellants' interpretation of the plain meaning of the Lease. That is, Article XIII of the Lease provided that the term 'Lessee' was to mean Tucker or his nominee corporation, 1920 North Meridian, and the Lessee (Tucker or 1920 North Meridian) was given a free right of assignment, coupled with a novation, following the completion of certain improvements upon the leased premises. *The plain and unambiguous language of Article XIII clearly discloses that the right to freely assign extended to 1920 North Meridian.*"

Appellees' Brief at 12–13 (emphasis added). The Meeks have hitched their wagon to a new horse and now argue that although the nominee corporation, 1920 North Meridian Corporation, did have a right to assign, its successor by merger, Shadeland, did not.

We agree that the trial court erred in concluding the free right to assign extended only to Fred C. Tucker. Article XIII of the lease contract addresses assignment and subletting. This section reads as follows:

"ARTICLE XIII

*Assignment and Sub-letting*

*Section 1. Assignment.* It is understood and agreed that Fred C. Tucker, Jr., the named Lessee herein, intends to assign this Lease to a nominee, being an Indiana corporation to be formed by Fred C. Tucker, Jr. and others, which corporation will assume this Lease and all obligations thereunder. It is understood and agreed that this Lease may be freely assigned to such Indiana corporation by Fred C. Tucker, Jr. at any time and, upon assumption of this Lease by such corporation, it shall be the Lessee hereunder as if it were the original party and solely liable and Fred C. Tucker, Jr. shall have no further liability hereunder, either as agent or individually. *The term 'Lessee' as used in this Lease throughout shall mean Fred C. Tucker, Jr. or such nominee corporation after assignment.*

Prior to the completion of construction of improvements on the Leased Premises required of Lessee pursuant to Article III hereof, Lessee (the nominee corporation) shall have no right to assign this Lease or any portion thereof without the written consent of Lessor first having been obtained.

After completion of the improvements on the Leased Premises called for by Article III hereof, *Lessee shall have the free right to assign this Lease without the consent of Lessor; and, upon such assignment becoming effective and the assumption by the assignee of all obligations of this Lease, Lessee shall have no further liability hereunder.*

*Section 2. Sub-letting.* Lessee shall have the right to sub-let the Leased Premises in whole or in part at any time without the consent of the Lessor.

*Section 3. Obligations of Assigns.* The covenants and agreements herein contained shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns."

(Emphasis added). The above emphasized language makes it clear that the assignability of the lease is not limited to Fred Tucker's assignment to a nominee corporation. The term lessee refers to Tucker *or* the nominee corporation. The language in the third paragraph under section one makes it clear that the lessee has the free right of assignment. Thus, 1920 North Meridian, the original nominee corporation, had the

free right to assign the lease without the consent of the lessor.

■ The Meeks' new argument, however, is that while the parties' intended 1920 North Meridian to have a right of free assignment, they did not intend for Shadeland, the surviving corporation through merger, to have this right. This argument fails for two reasons.

First, the express language of Article XIII, Section 3, states: "The covenants and agreements herein contained shall inure to the benefit of and be binding upon the parties hereto and their respective *successors* and assigns." Shadeland is a successor corporation and is entitled to the right to assign as agreed upon in section 3 of Article XIII.

More importantly, Shadeland is entitled to this right as a matter of law. IND. CODE 23-1-5-5 addresses the effect of mergers or consolidations on the rights and obligations of the corporations involved. This statute reads in pertinent part:

"23-1-5-5 *Effect of merger or consolidation*

Sec. 5. When such merger of consolidation has been effected as hereinabove provided:

\* \* \* \* \* \*

(d) Such single corporation shall thereupon and thereafter possess all the rights, privileges, immunities, powers and franchises as well of a public as of a private nature of each of the corporations so merged or consolidated; and all property, real, personal and mixed, and all debts due on whatever account, including subscriptions to shares of capital stock, and all other choses in action and all and every other interest, of or belonging to or due to each of the corporations so merged or consolidated shall be taken and deemed to be transferred to and vested in such single corporation without further act or deed; and the title to any real estate; or any interest therein, under the laws of this state vested in any of such corporations shall not revert or be in any way impaired by reason of such merger or consolidation;"

Under this statute a surviving corporation, after merger, possesses all the rights of each corporation merged. Thus, Shadeland possessed all the rights of 1920 North Meridian including the right to assign.

## II. *Release of Shadeland from liability upon assumption by San Antonio*

■ The trial court concluded that the October 13, 1977 assignment from Shadeland to San Antonio did not release Shadeland from liability to the Meeks. The court relied on the common law rule which states the original tenant's liability to his landlord arises by virtue of both privity of contract and privity of estate. Upon assignment, the original tenant is no longer liable under privity of estate, but usually remains liable to the landlord under privity of contract unless the landlord relieves him through a novation, release, or other act inconsistent with continuing contractual liability. *See Rauch v. Circle Theatre* (1978), 176 Ind. App. 130, 374 N.E.2d 546.

Shadeland argues this reliance on the general rule is misplaced because the lease contract expressly releases Shadeland from liability upon assumption by an assignee. We agree. Article XIII, section one explicitly states:

"... upon such assignment becoming effective and the assumption by the assignee of all obligations of this Lease, Lessee shall have no further liability hereunder."

By this provision the parties to the lease abrogated the common law rule which continued the tenant's liability under privity of contract after assignment. This point was discussed by another court in *1165 Fifth Avenue Corp. v. Alger* (1942), 288 N.Y. 67, 41 N.E.2d 461:

"General rules of law concerning the rights and liabilities of the assignor of a lease are not pertinent here. The parties here have agreed in advance that the liability of the original tenant comes to an end when he presents an assignment ... and a written assumption, by the assignee, of all future liability."

Indiana cases which have held that a lessee's liability on privity of contract continues after assignment have applied the rule only "[i]n the absence of a stipulation releasing a lessee who has assigned his lease...." *Powell v. Jones* (1912), 50 Ind. App. 493, 98 N.E. 646, 647. In *Rauch v. Circle Theatre, supra,* the court made the point that "[t]he lease executed by the parties contained no provisions that would discharge Lessee from its contractual obligations." 176 Ind.App. at 135, 374 N.E.2d at 551. Here the express language of the lease contract gave Shadeland the free right to assign without the consent of the lessor and upon assumption by the assignee of the obligations of the lease, Shadeland was released of further liability.

The question remains, however, as to whether Shadeland's assignment of the lease to San Antonio was effective, and whether San Antonio assumed the obligations of the lease thus releasing Shadeland of any future liability. The assignment read in pertinent part as follows:

"That the Assignor, for and in consideration of the sum of TEN DOLLARS ($10.00) and other goods and valuable consideration to it paid by Assignee, the receipt and sufficiency whereof is hereby acknowledged, and of the covenants and agreements of the Assignee hereinafter contained and on its part to be faithfully kept and performed, does hereby sell, assign, transfer, set over and deliver unto Assignee the following:

That certain Lease ... dated June 15, 1960 [further description omitted]

TO HAVE AND TO HOLD the same, together with all rights easements, privileges and appurtenances thereunto belonging or appertaining or held and enjoyed in connection therewith unto said Assignee, subject to any encumbrances or other matters herein mentioned:

SUBJECT, HOWEVER, to the payment of the rents reserved by the Lease and subject also to the observance and performance by the Assignee of each and every covenant and condition in the Lease contained, which, according to the terms and conditions thereof, are or should be observed and performed by the Leasee [sic];

And the Assignor, in consideration of the premises, does hereby covenant and agree to and with said Assignee that Assignor is the lawful owner of the Lease as described above and the term of years therein demised; that same is in full force and effect and that this Assignment is made free and clear of and from all encumbrances and other matters except: [description of taxes, zoning, survey, easement, etc. matters omitted];

And the Assignee, in consideration of the premises, does hereby promise, covenant, and agree to and with said Assignor and to and with the Lessor abovenamed, that Assignee will, effective as of and from the date of the execution of this instrument and during the remainder of the term of the Lease, pay the rents thereby reserved as and when the same become due and payable pursuant to the provisions of the Lease and will also faithfully observe and perform all of the covenants and conditions contained in the Lease, which are or should be observed and performed by the Lessee therein, and will at all times hereafter indemnify and save the Assignor and its successors and assigns harmless from and against the non-payment of the said rents or other charges and the non-observance of the covenants and conditions contained in the Lease and any and all costs, demands, expenses, judgments or fees that arise or occur by virtue of Assignees non-performance under the Lease.

In addition to the abovementioned covenants, agreements, and indemnities Assignee further understands and agrees that while any indebtedness remains due and owing to Assignor or Holiday Inns, Inc., its parent corporation, by virtue of this Assignment it shall:

(1) Promptly make all rental payments due under the Lease directly to Holiday Inns, Inc. Upon receipt of said rental payments Holiday Inns, Inc. will submit same to Lessor.

(2) Notwithstanding any provisions in the Lease to the contrary Assignee shall keep the premises and the personal property located therein insured against such casualties and with such companies and in such amounts as may be reasonably requested by Assignor to secure and protect its interest hereunder. Assignee shall provide Assignor with appropriate evidence of the required coverage and all such policies shall name both Assignor and Holiday Inns, Inc. as additional insured thereunder.

(3) In no event shall Assignee make any structural alteration, modification or improvement on or to the premises without the express written consent of Assignor.

(4) Assignee shall not make any assignments hereof or sublet the premises without the express written consent of Assignor.

(5) Assignee understands and agrees that neither Assignee nor anyone claiming by, through, or under Assignee shall have the right to file or place a lien or encumbrance of any kind or character whatsoever on the premises, or any building or improvement located thereon, and notice is hereby given that no contractor, subcontractor or anyone else that may furnish any material or service shall be entitled to any lien thereon whatsoever. For the further security of Assignor, Assignee shall be required to give actual notice of this restriction, in advance, to any persons, firms or corporations that may furnish any such material, service or labor.

(6) Assignee further agrees that it shall not remove, transfer, convey, sell or in any other manner dispose of any personal property located in the premises without the written consent of Assignor. A list of all such personal property is attached as Exhibit A to that certain Bill of Sale of even date herewith by and between Assignor and Assignee.

(7) In the event Assignee defaults under any term, condition, agreement, indemnity or warranty contained in this Assignment, or if Assignor should default in the payment of that certain Promissory Note of even date herewith payable to order of Holiday Inns, Inc. the terms and conditions of the Promissory Note being incorporated herein by this reference, then, and in any such event, Assignor *shall have the right to immediately terminate this Assignment and upon such termination Assignor shall have the immediate right to reenter and repossess the premises and remove all persons or things therefrom without being guilty of trespass.* In addition to the right of Assignor to terminate this Assignment as hereinabove provided, Assignor, without waiver of such right, may bring suit against Assignee for damages for non-compliance with any covenant, agreement or warranty contained in this Assignment for non-payment of any sum required to be paid to Assignor or for specific performance of any covenant contained herein. The waiver of any one event of default shall not be construed as a waiver of any other event of default.

(8) The parties hereto previously entered into an Assignment of Lease on the premises dated July 22, 1977. Upon execution hereof by both Assignor and Assignee this previous Assignment of Lease shall be deemed null and void and of no further force or effect, provided, however, that Assignee shall remain liable for all payments, rental and otherwise, due under the said previous Assignment." (Emphasis added)

The Meeks argue 1) that the assignment was conditional on San Antonio complying with the covenants of the lease and that the lease reverted to Shadeland upon San Antonio's failure to pay rent; and 2) that Shadeland reserved a reversionary interest of such significance that the "assignment" was in reality a sublease which did not absolve Shadeland of its liability to the

Meeks. On the other hand, Shadeland claims the language of the lease indicates it was an unconditional assignment and the mere reservation of a right of re-entry upon non-payment of rent is not significant to prevent the instrument from being an assignment. Shadeland argues that in any case the right of re-entry upon non-payment of rent and the other covenants in the assignment are not reversionary interests but only security for San Antonio's debt. Finally, Shadeland argues that even if it did retain reversionary interests, these were terminated upon payment by San Antonio of its debt to Shadeland and the assignment was complete, and unconditional by March, 1980 when San Antonio first failed to pay rent.

 An assignment is a transfer by a lessee of his entire leasehold interest. If a lessee transfers less than his entire leasehold interest so that an interest is retained in the leasehold, the transaction is a "sublease" rather than an assignment. *Indian Refining Co. v. Roberts* (1932), 97 Ind.App. 615, 181 N.E. 283. A sublease, as distinguished from an assignment, does not transfer a lessee's rights or obligations under the lease. The original lessee remains liable to the landlord for the payment of rent. *Indian Refining Co., supra.*

 The Meeks first contention is that, because Shadeland conveyed the lease "subject to" the performance of all covenants and conditions in the lease, it is a conditional conveyance. The Meeks' position is that the "subject to" language indicates San Antonio did not expressly assume the lease as required by Article XIII for a novation. The trial court apparently agreed finding the "subject to" language made the conveyance conditional upon San Antonio's subsequent performance. Under this analysis the lease would revert to Shadeland upon default as was the case here. The Meeks cite a number of cases for the proposition that "subject to" language prevents a complete and unconditional assignment.

We find this argument unpersuasive. When read in its true context, this section of the lease is merely a statement of explanation of the rights being assigned. It is a statement that the estate assigned by Shadeland to San Antonio is defined by the covenants and conditions of the original lease. A plain reading of this section does not condition the assignment on the performance of San Antonio.

Nor do the cases cited by the Meeks— *Hancock v. Fleming* (1815), 103 Ind. 533, 3 N.E. 254; *Coles Trading Co. v. Spiegel* (9th Cir.1951), 187 F.2d 984,—support such a conclusion. No case cited stands for the proposition that the "subject to" language renders an assignment conditional. In *Hancock*, supra, the issue was whether one who buys property subject to a mortgage is personally liable on the mortgage. The court concluded that "subject to" does not in and of itself mean "assume." The court did not in any way suggest the assignment was conditional. The distinction between mortgages and lease assignments is obvious and we find *Hancock* unpersuasive.

In *Coles Trading Co., supra,* the court held the taking of a lease "subject to the terms of" the overlying lease did not impose contractual liability on a sub-lessee to a lessor for certain covenants in the original lease. That case involved a lessee suing a sub-lessee over a document specifically labeled a sublease. *Coles Trading Co.* did not in any way hold that the "subject" to language made the sublease conditional.

Next we address the Meeks' contention that Shadeland reserved such a significant reversion so as to make the transfer a sublease. The Meeks refer to the right of re-entry Shadeland reserved upon the breach of certain covenants. Shadeland characterizes its rights differently reminding the court that it loaned money to San Antonio to finance its venture and asserts that the right of re-entry was merely security for that debt.

 The question of whether a right of re-entry upon the breach of a covenant constitutes a reversion for purposes of the assignment/sublease distinction was discussed at length in *Indian Refining Co. v.*

*Roberts, supra.* The court noted the split of authority and concluded that a right of re-entry was not a reservation of a reversion:

> "It appeals to this court that the better view is that, when the lessee parts with his whole interest as lessee, it will, as to the landlord, amount to an assignment of the lease, and the effect of the instrument, as an assignment, so far, at least, as the original lessor is concerned, will not be destroyed by its reserving a new rent to the assignor, with a power of re-entry for nonpayment of the rent. The right of re-entry is not an estate or interest in land; it does not imply a reservation of a reversion; it is a mere chose in action, and, when enforced, the grantor is in through the breach of condition and not by the reverter; it exists only as an incident to an estate or interest for the protection for which it is reserved."

*Indian Refining,* 97 Ind.App. at 631, 181 N.E. at 289. In *Indian Refining* the right of re-entry was only for nonpayment of rent. Here, nonpayment of rent is only one of the conditions for which Shadeland may re-enter. Others include: lack of premises insurance, unauthorized structural modification, an unauthorized sublease, and disposal of personal property on the premises without consent. We think, however, the *Indian Refining* rationale is still applicable. Shadeland's rights are mere choses in action enforceable through breach of condition not by reverter. They exist only as an incident to an estate and under *Indian Refining* do not constitute sufficient reversion to keep Shadeland's transfer of the lease to San Antonio from being an assignment.

■ In any case, we agree with Shadeland that the assignment was complete and unconditional by September, 1978. Shadeland's right of re-entry existed only until San Antonio paid its debt to Shadeland. The debt was paid within a year of the assignment and on September 6, 1978 the assignment was recorded in the office of the Marion County Recorder. Thereafter,

Shadeland's right of re-entry ceased to exist, and San Antonio paid rent directly to the Meeks. This arrangement continued until July 1980 when San Antonio vacated the premises. The Meeks complaint avers no rent was paid to the Meeks after March 1980.

Thus, the breach occurred when San Antonio failed to pay rent in March 1980. This was a full year and one-half after Shadeland's assignment to San Antonio became complete, effective and unconditional. Once the assignment is complete, the assignor is absolved of liability to the original lessor. *Indiana Refining, supra.*

### III. *Tort liability with respect to assignment of the lease*

The trial court made the following conclusion:

> "Shadeland and Holiday Inn owed a duty to Plaintiffs to use reasonable care in selecting and securing an assignee capable of performing under the terms of the Lease for the balance of the Lease term or roughly 45 years.

The trial court then went on to conclude that Shadeland had not used reasonable care in assigning the lease to San Antonio and was liable to The Meeks for damages to the premises after San Antonio vacated.

Shadeland contends the trial court is in error because no duty exists as a matter of law and none can be inferred from the lease. We are compelled to agree.

■ The trial court cited no authority for its conclusion that a duty to use reasonable care in selecting an assignee exists and we are likewise unable to unearth any authority. This is not surprising as any such duty would be a restriction on alienation of land and such restrictions are not favored in law. *Drake v. Eggleston* (1952), 123 Ind. App. 306, 108 N.E.2d 67. *See also* 49 Am. Jur.2d *Landlord and Tenant* Sec. 407 (1970). How and to whom a leasehold may be assigned is a matter for contract law to be decided by the landlord and tenant each bargaining in his own interest. The existence of a duty to find a solvent assignee

would unduly inhibit the parties from fashioning an agreement in their own best interests.

■ Thus, we look to the lease language itself to determine if the parties created a duty on Shadeland to use reasonable care in selecting a tenant. There is no clause in the lease that specifically places a duty on Shadeland to chose any particular type of assignee, nor can any be inferred. On the contrary, the lease language emphasizes the lack of any such duty: "Lessee shall have the *free* right to assign this lease without the consent of the lessor...."

The nature of this transaction also makes us hesitant to infer a duty to choose a particular type of assignee. Shadeland's free right of assignment came into being under lease Article XIII only after Shadeland had at its own expense constructed a new building on the lease premises which was sufficient for "operation of a motel with all allied services and facilities." The building became the property of the Meeks upon any termination of the lease. Thus, at the time of any assignment, the lessor would have the security of the buildings in the event of a non-performance by an assignee.

Because of this security it is not unreasonable for the parties to place no duty on Shadeland to choose a particular assignee. In 2 *POWELL ON REAL PROPERTY*, paragraph 242 (1983) the following appears in a section entitled "Modern Leasing Practices":

"It is not uncommon to find provisions by which the original lessee ceases to be liable under the lease upon an assignment to a transferee who assumes the performance of the lease's agreements. Such a provision is reasonable when the lessor finds his safety in the buildings erected on the premises at the lessee's expense rather than in the continuance of the lessee's personal liability."

Similarly, 1 *FRIEDMAN ON LEASES* Sec. 7.1 (1983) contains the following statement in a section on "Business and Practical Aspects of a Tenant's Right to Assign and Sublet":

"If a tenant agrees to erect a building on leased premises the completion of this building will give the landlord a matchless security and will reduce or eliminate the landlord's need for other security. This lease may provide that upon completion of the structure there will be a right to assign the lease with little limitation and, perhaps also, for a release of the tenant from any further personal liability under the lease."

These statements indicate Shadeland's *"free* right to assign the lease" upon the completion of a building is not an uncommon lease practice. A similar situation was addressed in *Alexander v. Theatre Realty Corp.* (1934), Ky., 70 S.W.2d 380, where the lease in question contained a clause which released the tenant upon assignment and assumption by the assignee, if the tenant was not in default at the time of the assignment. It was conceded that the assignment had been made by the tenant to an assignee the tenant knew to be insolvent for the avowed purpose of securing release of the liability for future payment of rent.

The Court of Appeals of Kentucky pointed out that the lease provided for a deposit of $250,000.00 in securities with the landlord, forfeitable upon default by the tenant. The deposit could be and had been used at the tenant's option to construct a building of at least that cost on the real estate. Without such security, the *Alexander* court said it might consider implying an obligation that any assignee be solvent because the landlord would be concerned about the performance of the assignee. But, the court said, the lease at issue did not present such a situation:

"[The landlord] apparently took no thought as to who or what should be his lessee's or his responsibility, but, on the other hand, relied for his protection in securing the performance of the lease, or its equivalent in value, upon his requirement that there should be not less than $250,000 deposited with the trustee to guarantee its performance. Such security given him therefor, under the general

conditions existing at the time the lease was made, he evidently felt amply secured for him yet another profitable experience with a long-term lease, regardless of who might be his tenant thereunder or what his or its financial condition might then or later prove to be, but was rather influenced and acted upon the principle that the pledged securities, or improvements into which converted, afforded and was safer security for performance of the lease covenants than the questionable responsibility of assignees. Under these circumstances, the provisions of clause 16, giving to his tenant, when not in default, the right to make assignment of the lease in the manner provided, and thereby terminate his personal liability thereunder, was not unusual or other than one which might have been reasonably intended by the parties.

 \* \* \* \* \* \*

The appellant ... insists that its clause 16 should be construed to impose by implication a qualification upon the lessee's right to make assignment of the lease—that it must be made in good faith to one believed reasonably capable of carrying out its covenants before lessee is to be released from its personal liability thereunder. But the clause in question does not grant the lessee the right of assignment upon such conditions or limitations, since it expressly authorized an assignment without any condition or qualification except that named, that the tenant should not be in default."

*Alexander*, 70 S.W.2d at 386, 387. The *Alexander* court refused to infer a duty on the part of the tenant to a choose an assignee who is able to perform.

Similarly in *Jenkins v. John Taylor Dry Goods* (1944), 352 Mo. 660 179 S.W.2d 54, the court held that a tenant was released pursuant to an express term of the lease because the lease's specific requirements, including the construction of a $40,000.00 building, were satisfied:

"The most important single circumstance is whether the parties in contracting (as shown by the lease), especially the landlord, relied for his protection in securing performance of the lease and the payment of rent on the solvency of his tenant and his continuous occupancy of the premises or whether he relied for his security on the erection of the contemplated improvements which would enhance the value of his property and become his upon the termination of the lease.... If the landlord had desired greater security or wished for longer occupancy by his tenant he could have stipulated for a more expensive building or against a release. On the contrary, he has expressly permitted an assignment and promised a release when a $40,000 building has been constructed and all obligations maturing prior to the construction are not in default.

*Jenkins*, 179 S.W.2d at 60. *See also 1165 Fifth Avenue Corp. v. Alger, supra; Norcomo Corp. v. Franchi Construction Co.* (1979), Mo.Ct.App., 587 S.W.2d 311; *Tiernan v. Sheldon* (1966), Fla.Dist.Ct.App., 191 So.2d 87.

The transaction at bar is similar to those described in the above authorities. As the contract is clear on its face and no duty on Shadeland's part to use any particular care is expressed, nor can any be inferred, we conclude the trial court erred as a matter of law in finding that Shadeland had a duty to use reasonable care in assigning the lease.

## IV. *Holidays Inns' liability to The Meeks*

The trial court held Holiday Inns liable to the Meeks because Holiday Inns owned Shadeland's stock and the trial court pierced the corporate veil. No other relationship between the Meeks and Holiday Inns was pleaded or found by the trial court. Since we have found Shadeland has not breached any contractual duty to the Meeks and is not liable in any way, neither is Holiday Inns.

In conclusion, the lease agreement gave Shadeland, as the surviving corporation of merger with 1920 North Meridian Corporation, the right to freely assign the lease.

Shadeland effectively assigned its leasehold to San Antonio Inns, Inc. so as to release itself of any liability. The lease agreement did not place on Shadeland any duty to use reasonable care in selecting an assignee. Finally, because Shadeland is not liable to the Meeks, neither is its parent corporation, Holiday Inns.

We reverse the trial court's entry of summary judgment in favor of the Meeks and remand for entry of summary judgment in favor of Shadeland and Holiday Inns.

Reversed.

YOUNG, P.J., and CONOVER J. concur.