BOARD OF COMMISSIONERS OF DE-LAWARE COUNTY (Appellant–Defendant Below); East Central Indiana Trotting and Pacing Association and Ernest L. Sutton (Appellants–Plaintiffs Below); Everett Jackson, Joe Lewis, Bud Everhart, John Justice, Ernest Sutton, Herb Hoover, Kenneth Snow, Larry Beeman, Gene Oakerson, and Charles Turner (Appellants–Defendants Below).

v.

LIONS DELAWARE COUNTY FAIR, INC., Appellee–Defendant Below.

No. 18A04–9104–CV–116 [1].

Court of Appeals of Indiana, Third District.

Oct. 28, 1991.

---

1. This case was diverted to this office by order of the Chief Judge.

Donald H. Dunnuck, Dale E. Hunt, Dunnuck, Teagle & Hunt, Muncie, for Bd. of Com'rs of Delaware County.

Jack Quirk, Muncie, for East Cent. Ind. Trotting & Packing Assoc., Ernest L. Sutton, and Everett Jackson et al.

John M. Feick, Cross, Marshall, Schuck, DeWeese, Cross & Feick, P.C., Muncie, for Lions Delaware County Fair, Inc.

STATON, Judge.

The appellants appeal from a judgment for Lions Delaware County Fair, Inc. ("Lions") raising five issues which may be consolidated into three:

I. Whether the judgment of the trial court was contrary to law.

II. Whether the trial court erred in its treatment of the appellants' motion for summary judgment.

III. Whether the trial court erred in not entering special findings and conclusions in support of the judgment.

We affirm.

The Delaware County Fairgrounds were purchased by the County in 1890 and became the site of the annual Delaware County Fair. In 1961, the Board of Commissioners of Delaware County (Board), looking for an organization to assume the duties of conducting the annual fair, entered into a lease with Lions. Under the terms of the lease, Lions was leased the Fairgrounds, which they agreed to maintain. In addition, Lions, a non-profit service organization, agreed to conduct the annual fair and make the premises available to county 4–H clubs. The lease also provided that all buildings and structures were the property of Lions, and stated that Lions could not assign the lease without consent of the Board. The lease term ended on April 24, 1978, but in 1967, it was extended another thirty years to provide for a long-term improvement program implemented by Lions.

It became the custom for Lions to rent stable space in the barns to horsemen, who trained their horses on the fairgrounds track. The leases provided that "Any authorized volunteered repair, is at lessee's expense and is *not* a reduction of the lease." Record, p. 24. (Emphasis in original.) At some time during the relationship between the horsemen and Lions, Lions indicated a need to raise the rent in order to provide finances for maintenance, but the horsemen agreed to provide maintenance for the barns if the rental fee would stay the same. At some point, the horsemen formed an association, the East Central Indiana Trotting and Pacing Association (ECITPA), which began to make improvements to the track. Maintenance to the track and barns appears to have been performed in recent years as a result of a sort of loose agreement between ECITPA and Lions, with each organization funding and providing labor for a number of the required tasks.

In the latter part of 1989, Lions began to be concerned about liability, and rewrote the new leases with higher rentals and which required proof of insurance before a horseman could lease a stall. Pursuant to the former leases, notice was given that the horsemen would have to vacate the stalls unless they signed a new lease. The horsemen objected, claiming that the insurance was too expensive and too difficult to get. They attempted to tender their next month's rent pursuant to the original lease, but their checks were returned. Nonetheless, the horsemen stayed in the stalls.

Lions was unable to come to an accord with ECITPA as to a date for the fair, so it was determined that the 1990 fair would not have harness races. Lions also decided that it would not approve the annual "Matinee" on the fairgrounds, which is the annual fund raising event for ECITPA.

Lions filed suit against the horsemen for ejectment and back rent. ECITPA in turn sued Lions and the Board on a third-party beneficiary theory, alleging that Lions had not properly maintained the fairgrounds,

that Lions had assigned portions of the lease, and that the lease was void as against public policy. The complaint also alleged that the Board had failed to enforce the lease.

ECITPA then dismissed its third-party beneficiary claim and amended its complaint, alleging in its new claim that it was told it could conduct the money-making event on the fairgrounds, had expended money in reliance, and then was told it could not have the event. The complaint requested $5000 in compensatory and $10,-000 in punitive damages. The county cross-claimed, alleging that the lease was void as violative of statutes in effect at the time of the signing of the lease which limited the length of time a county could lease county property, and requested that the lease be cancelled and Lions be ejected.

The lawsuits were consolidated, and the Board filed a motion for summary judgment. The motion for summary judgment was denied, and after a bench trial, judgment was entered in favor of Lions on all claims. ECITPA, the individual horsemen, and the Board bring this appeal.

## I.

### Whether the Judgment was Contrary to Law

■ ECITPA appeals a negative judgment on its complaint, the horsemen appeal an adverse judgment on the actions on the stable leases, and Board appeals a negative judgment on its counterclaim.[2] When reviewing an appeal from a negative judgment we must determine whether the judgment is contrary to law. In re Marriage of Wooten (1990), Ind.App., 563 N.E.2d 636, 638. A judgment is contrary to law when the evidence is without conflict and leads to but one conclusion which is contrary to that reached by the trial court. Id. In addressing the question of whether a negative judgment is contrary to law, we consider only the evidence on the record most favorable to the prevailing party without reweighing the evidence or judging the credibility of the witnesses. Id.

■ When a party seeks to reverse an adverse judgment on the ground that the evidence is insufficient to support the judgment, we will not reweigh the evidence. In re Paternity of Tomkins (1989), Ind.App., 542 N.E.2d 1009, 1013. Rather, we will look to the evidence most favorable to the judgment and all reasonable inferences to be drawn therefrom, and will affirm if there is substantial evidence of probative value. Id.

■ In addition, the judgment entered in this case is a general judgment, which may be affirmed upon any theory supported by the evidence. Hollars v. Randall (1990), Ind.App., 554 N.E.2d 1177, 1178.

■ Appellants mount a two-pronged attack on the judgment: 1) the lease between the county and Lions is void and against public policy; and 2) the judgment was against the weight of the evidence. With respect to the first prong, they argue that the original Board of Commissioners was not statutorily permitted to enter into the lease, and to permit counties to enter into such leases would deprive the county and the public from retaining a meaningful role in decisions made about the property.

Appellants cite an amalgam of statutes and caselaw from which they extrapolate a rule that the Board did not have the statutory authority to enter into the lease in question. However, neither party cites the statutes which are dispositive of the issue.[3]

---

2. The distinction between an adverse judgment and a negative judgment was set out in the recent opinion of Vanderburgh County Bd. of Comm'rs v. Rittenhouse (1991), Ind.App., 575 N.E.2d 663. "A negative judgment is one entered against a party who bears the burden of proof, while an adverse judgment is one entered against a party defending on a given question." Id. 666.

3. Lions instead argues that the Board is estopped from challenging the validity of a lease where it has reaped the benefits of the lease for three decades, noting that estoppel may be invoked against governmental entities. See Cablevision of Chicago v. Colby Cable Corp. (1981), Ind.App., 417 N.E.2d 348, transfer denied. In fact, one of the commissioners testified that the Board would not have the resources to run the fair were it not for the Lions, and the Board would be in "bad shape" without the Lions'

In 1961, when the original lease was executed, title 26, chapter 15 of Burns' statutes dealt with fairgrounds. It authorized the County Board of Commissioners to purchase real estate to be used for fairgrounds,[4] to resell the fairgrounds,[5] to convey the fairgrounds to a city within the county,[6] and to turn over the land to an agricultural society or association for conducting agricultural fairs thereon.[7] It contained no prohibition against leasing property to a nonprofit organization to run the fairs. More telling is section 26–620, outlining the powers and duties conferred upon the commissioners, which provides *inter alia* that "[s]uch commissioners in their respective counties shall have power at their meetings ... to lease real estate belonging to the county, and not being used for the benefit of the public, to any nonprofit organization formed for the purpose of promoting the commercial, industrial, or civic interest of the county, for any period not exceeding ninety-nine (99) years...." We conclude the Board had authority to lease the fairgrounds to the Lions Club.

 The Appellants' second prong attacks the weight of the evidence in support of the judgment. This is simply a request that we reweigh the evidence. They argue at length that the evidence showed that the Lions failed to keep up the fairgrounds as required by the lease. It is unclear how this evidence has any bearing on any relevant issue in the case.[8] However, at least one witness testified that the grounds were in satisfactory condition, Lions introduced evidence that money was spent on the maintenance of the facilities, and the trial judge personally viewed the fairgrounds at the request of the parties. It is the trial court's task to weigh the evidence.

 Appellants also argue that Lions violated the lease by subleasing without permission from the Board. The lease contains a prohibition against *assignment*, not subleasing. An assignment is the transfer by a lessee of one's entire leasehold interest, while a sublessor transfers less than his entire leasehold interest so that he retains an interest in the leasehold. *Shadeland Development Corp. v. Meek* (1986), Ind.App., 489 N.E.2d 1192, 1199, *transfer denied*. A sublease, as distinguished from an assignment, does not transfer a lessee's rights or obligations under the lease. *Id.* Appellants' argument is without merit.[9]

 Appellants contend that the lease is void because it provides that the Lions own the buildings on the property and may remove them after the lease term. If a tenant erects buildings under an agreement with the owner that they belong to him and is expressly given the right to remove them, they remain personalty. *Merrell v. Garver* (1913), 54 Ind.App. 514, 523, 101 N.E. 152, *transfer denied*. Here, the record indicates Lions invested considerable capital in the construction and maintenance of the buildings, and the county could well have agreed that Lions owned the buildings in consideration for the responsibilities which the Lions assumed, including continuing maintenance of the buildings and grounds and the funding, promotion, organization, and administration of the annual fair.

 Finally, Appellants argue that the evidence was insufficient to establish that the notice of termination provided by Lions

intervention. While we find Lions' argument persuasive, we will address the statutory issue.

4. Ind.Code Ann. § 26–1517 (Burns 1960).

5. IC 26–1519.

6. IC 26–1532.

7. IC 26–1533.

8. Apparently, appellants argue that the alleged substandard maintenance rendered the lease void.

9. Paragraph 8 of the lease provides, "It is agreed by the parties hereto that the Lions shall have no right to *assign* this Lease in whole *or in part* thereof without the written consent of the County Commissioners first had and obtained." (Emphasis added.) One may assign a part of a leasehold; he simply transfers his entire interest to part of the property. This is to be distinguished from a sublease where the tenant retains a reversion in the whole or a part of the leasehold following the subtenancy. R. Cunningham, W. Stoebuck and D. Whitman, *The Law of Property* § 6.66 at 382 (1984).

to the horsemen complied with the following clause in the subleases:

This lease may be terminated by either of the parties by thirty days legal notice to the adverse party before the expiration of the lease and such notice shall be required of each party in order to terminate said lease, but otherwise the tenancy hereby created shall be construed to be a tenancy from year to year.

Record, p. 23. They argue that "legal notice" requires proof of service, citing Indiana Code 32-7-3-5, which applies to holdover tenancies. The horsemen were not holdover tenants at the time notice was given to terminate the lease.

Indiana Code 32-7-1-8 provides the general statutory requirement for service of notices within landlord-tenant relations:

Notice as required in sections 1 through 7 of this chapter, may be served on the tenant, or if he can not be found, by delivering the same to some person of proper age and discretion, residing on the premises, having first made known to such person the contents thereof; and if no such person can be found on the premises, then by affixing copy of such notice to a conspicuous part of said premises.

The record reveals that Lions mailed notice to each of the subtenants in addition to posting the notice on the stables. Most of the horsemen acknowledged receiving the letters. Further, the record reveals that all of the horsemen had actual notice of the termination of the subleases. Thus, we conclude that adequate notice was provided by Lions to terminate the lease.

The trial court's judgment was not contrary to law.

## II.

### Hearing on Summary Judgment

Appellants next contend that they were not afforded a hearing on their summary judgment motion. However, the record reveals that the trial judge heard arguments on the motion and gave the parties an opportunity to present evidence. Both parties declined, and the trial judge denied the motion, finding that there were genuine issues of material fact precluding the entry of summary judgment. We find no error.

## III.

### Special Findings and Conclusions

Appellants finally argue that the trial court erred in failing to enter findings of fact and conclusions of law, contending that this lawsuit was the review of an action by administrative agency pursuant to Trial Rule 52(A)(2). In the alternative, they assert that this case presents a situation where we should make a judicial exception to the rule that findings and conclusions are not required if not requested. This case was clearly not a review of an administrative action, it was a lawsuit brought in the first instance by Lions in the trial court. Moreover, Appellants give no reason why this case warrants a special judicial exception to Trial Rule 52, and we see no reason to make such an exception.

Appellants also contend that the court erred in failing to set out a description of the property, as its judgment was a judgment affecting title to property. They cite *Ratliff v. Stretch* (1889), 117 Ind. 526, 20 N.E. 438. Their contention must fail—the judgment did not affect the title to property. Title to the fairgrounds was held by the County before the lawsuit was filed, and title continued to be in the County after judgment was entered.

Affirmed.

GARRARD, J., concurs in result.

CHEZEM, J., concurs.